*PRELIMINARY PRINT*

# VOLUME 602 U. S. PART 1

PAGES 526–555

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 20, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# DIAZ *v.* UNITED STATES

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 23–14.   Argued March 19, 2024—Decided June 20, 2024

Petitioner Delilah Diaz was stopped at a port of entry on the United States-Mexico border.   Border patrol officers searched the car that Diaz was driving and found more than 54 pounds of methamphetamine hidden in the vehicle.   Diaz was charged with importing methamphetamine in violation of 21 U. S. C. §§ 952 and 960, charges that required the Government to prove that Diaz "knowingly" transported drugs.   In her defense, Diaz claimed not to know that the drugs were hidden in the car. To rebut Diaz's claim, the Government planned to call Homeland Security Investigations Special Agent Andrew Flood as an expert witness to testify that drug traffickers generally do not entrust large quantities of drugs to people who are unaware they are transporting them.   Diaz objected in a pretrial motion under Federal Rule of Evidence 704(b), which provides that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."   The court ruled that Agent Flood could not testify in absolute terms about whether all couriers knowingly transport drugs, but could testify that most couriers know they are transporting drugs.   At trial, Agent Flood testified that most couriers know that they are transporting drugs.   The jury found Diaz guilty, and Diaz appealed, challenging Agent Flood's testimony under Rule 704(b).   The Court of Appeals held that because Agent Flood did not explicitly opine that Diaz knowingly transported methamphetamine, his testimony did not violate Rule 704(b).

*Held*: Expert testimony that "most people" in a group have a particular mental state is not an opinion about "the defendant" and thus does not violate Rule 704(b).   Pp. 531–538.

   (a) Federal Rule of Evidence 704(a) sets out a general rule that "[a]n opinion is not objectionable just because it embraces an ultimate issue." The provision at issue, Rule 704(b), is an exception to that general rule. Rule 704 departed from the once-prevailing common-law practice that a witness could not state their conclusions on any ultimate issue, *i. e.*, issues that the jury must resolve to decide the case.   See *United States* v. *Spaulding*, 293 U. S. 498, 506.   When adopted in 1975, Rule 704

had no exceptions: All ultimate-issue opinions were permitted. Years later, Rule 704(b) was adopted to proscribe only expert opinions in a criminal case that are about whether a defendant has "a mental state or condition" that is "an element of the crime charged or of a defense." Pp. 531–534.

(b) In this case, Agent Flood did not express an opinion about whether Diaz herself knowingly transported methamphetamine. Instead, he testified about the knowledge of *most* drug couriers. That opinion does not necessarily describe Diaz's mental state. Because Agent Flood did not express an opinion about whether Diaz herself knowingly transported methamphetamine, his testimony did not violate Rule 704(b).

Diaz's counterarguments are unpersuasive. She first argues that Agent Flood functionally stated an opinion about whether she knowingly transported drugs when he opined that most couriers know that they are transporting drugs. But an opinion about *most* couriers is not an opinion about *all* couriers. Agent Flood asserted that Diaz was part of a group of persons that *may* or *may not* have a particular mental state. The ultimate issue of Diaz's mental state was thus left to the jury's judgment. Diaz next relies on dictionary definitions of "about" to argue that Rule 704(b)'s phrase "state an opinion about" includes all testimony that "concerns" whether the defendant had a particular state of mind. That text's surrounding context, however, makes clear that Rule 704(b) addresses only conclusions as to the defendant's mental state. Rule 704(a) further confirms the narrow scope of testimony prohibited by Rule 704(b). Because Rule 704(b) is an "exception" to Rule 704(a), Rule 704(b) can only be understood to cover a subset of the testimony that Rule 704(a) expressly allows, which is opinion testimony that includes ultimate issues. Diaz's reading would have the exception swallow the rule. Pp. 534–537.

Affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. JACKSON, J., filed a concurring opinion, *post*, p. 538. GORSUCH, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined, *post*, p. 542.

*Jeffrey L. Fisher* argued the cause for petitioner. With him on the briefs were *Pamela S. Karlan, Easha Anand, L. Nicole Allan*, and *Carlton F. Gunn*.

*Matthew Guarnieri* argued the cause for the United States. With him on the brief were *Solicitor General Pre-*

*logar, Acting Assistant Attorney General Argentieri, Deputy Solicitor General Feigin,* and *Javier A. Sinha.**

JUSTICE THOMAS delivered the opinion of the Court.

Federal Rule of Evidence 704(b) prohibits expert witnesses from stating opinions "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." In this drug-trafficking prosecution, petitioner argued that she lacked the mental state required to convict because she was unaware that drugs were concealed in her car when she drove it across the United States-Mexico border. At trial, the Government's expert witness opined that most drug couriers know that they are transporting drugs. Because the expert witness did not state an opinion about whether petitioner herself had a particular mental state, we conclude that the testimony did not violate Rule 704(b). We therefore affirm.

I

In August 2020, Delilah Diaz, a United States citizen, attempted to enter the United States from Mexico. When Diaz drove into the port of entry, a border patrol officer asked her to roll down the car's rear driver-side window. Diaz responded that the window was manual, so the officer left his inspection booth and tried to roll down the window himself. The officer "felt some resistance" and then heard "a crunch-like sound in the door." App. 25. Aware from experience that car doors are a common hiding spot for con-

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Criminal Defense Lawyers by *Carmen Iguina González, Joshua Matz, Sean Hecker, David Patton,* and *Joshua L. Dratel*; and for the National Association of Federal Defenders by *Vincent J. Brunkow, Cathi Shusky,* and *Shelley Fite.*

*Matthew Coles* filed a brief for John Monahan et al. as *amici curiae* urging affirmance.

traband, the officer investigated further with a "buster," a handheld tool that measures an object's density. After the buster detected an abnormal density in the doors, officers brought in a narcotics detection canine and sent the car through an X-ray machine. They discovered 56 packages of methamphetamine tucked inside the car's door panels and underneath the carpet in the trunk. The methamphetamine weighed just over 54 pounds and had an estimated retail value of $368,550.

Diaz was arrested and, after waiving her *Miranda* rights, agreed to an interview. See *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Diaz claimed that she had no idea drugs were hidden in the car. The officers, however, found her story hard to believe. Diaz explained that she was driving her boyfriend's car. Contradictorily, she also told officers that she had seen her boyfriend only "two, three times tops," did not know his phone number, and did not know where he lived. Response in Opposition in No. 3:20–cr–02546 (SD Cal.), ECF Doc. 33–1, p. 13. Diaz's story grew even more dubious when officers questioned her about two cellphones discovered inside the car. She acknowledged that she owned one of the phones. But, she maintained the other phone had been "given to [her]" by a friend—whom she would "rather not" identify. *Id.*, at 32, 34. And, she insisted that the phone was "locked" and that she did not "have access to it." *Id.*, at 32–33.[1]

Diaz was charged with importing methamphetamine in violation of 21 U. S. C. §§ 952 and 960. The charges required the Government to prove that Diaz "knowingly" transported drugs. In response, Diaz asserted what is known colloquially as a "blind mule" defense: she argued that she did not know that there were drugs in the car. Before trial, the

---

[1] Between her conviction and sentencing, Diaz confessed that she had fabricated the boyfriend story. She also admitted that she had previously smuggled drugs into the United States and had volunteered to make the drug run that led to her arrest.

Government gave notice that it would call Homeland Secu-
rity Investigations Special Agent Andrew Flood as an expert
witness. Agent Flood would testify about the common
practices of Mexican drug-trafficking organizations. Spe-
cifically, he planned to explain that drug traffickers "gener-
ally do not entrust large quantities of drugs to people who
are unaware they are transporting them." United States'
Notice, ECF Doc. 30, p. 7.

Diaz objected to Agent Flood's proffered testimony under
Federal Rule of Evidence 704(b). That Rule provides that,
"[i]n a criminal case, an expert witness must not state an
opinion about whether the defendant did or did not have a
mental state or condition that constitutes an element of the
crime charged or of a defense." Diaz argued that if Agent
Flood testified that drug traffickers *never* use unknowing
couriers, that would be functionally equivalent to an opinion
about whether Diaz knowingly transported drugs. The Dis-
trict Court granted Diaz's motion in part and denied it in
part. The court agreed with Diaz that Agent Flood could
not testify in absolute terms about whether all couriers
knowingly transport drugs. But, insofar as Agent Flood
planned to testify only that most couriers know they are
transporting drugs, the court concluded that his testimony
was admissible.

At trial, Agent Flood testified that "in most circumstances,
the driver knows they are hired . . . to take the drugs from
point A to point B." App. to Pet. for Cert. 15a. To use an
unknowing courier, Agent Flood explained, would expose the
drug-trafficking organization to substantial risk. The orga-
nization could not guarantee where, if at all, the drugs would
arrive. *Id.*, at 16a, 26a. Even if the drugs reached the in-
tended destination, the organization would then have to re-
trieve the drugs without detection. *Id.*, at 16a, 24a–25a.
According to Agent Flood, drug-trafficking organizations are
often unwilling to take those chances with hundreds of thou-
sands of dollars on the line. Agent Flood acknowledged on

cross-examination that drug-trafficking organizations sometimes use unknowing couriers.

The jury found Diaz guilty, and the District Court sentenced her to 84 months' imprisonment. On appeal, Diaz again challenged Agent Flood's testimony under Rule 704(b). The Court of Appeals held that Rule 704(b) prohibits only "an 'explicit opinion' on the defendant's state of mind." 2023 WL 314309, *2 (CA9, Jan. 19, 2023). Because Agent Flood did not opine about whether Diaz knowingly transported methamphetamine, the court concluded that the testimony did not violate Rule 704(b). *Ibid.*

We granted certiorari, 601 U. S. —— (2023), and now affirm.

## II

Federal Rule of Evidence 704 addresses "Opinion[s] on an Ultimate Issue." Rule 704(a) sets out a general rule that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Rule 704(b) adds one caveat:

> "EXCEPTION: In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."

Rule 704 departed from the once-prevailing common-law practice. Prior to Rule 704, many States applied what was known as the "ultimate issue" rule. That rule categorically barred witnesses from "stat[ing] their conclusions on" any "ultimate issue"—*i. e.*, issues that the jury must resolve to decide the case. *United States* v. *Spaulding*, 293 U. S. 498, 506 (1935); see 7 J. Wigmore, Evidence § 1921, p. 18 (3d ed. 1940) (Wigmore) (explaining that an ultimate issue is "the exact question which the jury are required to decide" (internal quotation marks omitted)). For example, in a medical malpractice suit, an ultimate issue may be "whether [the] plaintiff's condition resulted solely from malpractice."

*DeGroot* v. *Winter*, 261 Mich. 660, 671, 247 N. W. 69 (1933). In a murder case, by way of comparison, an ultimate issue may be who fired the gun that killed the victim. See *State* v. *Carr*, 196 N. C. 129, 131–132, 144 S. E. 698, 700 (1928). Under the common-law rule, a witness could not provide his answer to those ultimate issues. Witnesses remained free, however, to offer related testimony, even testimony that directly helped the jury resolve an ultimate issue. See, *e. g.*, *Furlong* v. *Carraher*, 108 Iowa 492, 495, 79 N. W. 277, 278 (1899) (holding that witness could not testify about deceased's mental capacity to enter will, but could testify to her "condition of . . . mind at the time the will was executed"); *DeGroot*, 261 Mich., at 671, 247 N. W., at 69 (holding that witness could testify that plaintiff's condition could have resulted from malpractice); *Hill* v. *State*, 134 Tex. Crim. 163, 169, 114 S. W. 2d 1180, 1183 (1938) (holding that witness could testify in a murder case on how "the bruises and wounds on the deceased's body could have been caused").

The logic underpinning the ultimate-issue rule was that it prevented witnesses from taking over the jury's role. See 1 K. Broun, McCormick on Evidence 80 (7th ed. 2013) (McCormick) (explaining that the rule's "stated justification" was to exclude testimony that "usurps the function" or "invades the province of the jury" (internal quotation marks and footnote omitted)). If a witness gave an opinion "covering the very question which was to be settled by the jury," some feared that the jury would be left with "no other duty but that of recording the finding of [the] witnes[s]." *Chicago & Alton R. Co.* v. *Springfield & N. W. R. Co.*, 67 Ill. 142, 145 (1873).

Although the ultimate-issue rule's exact origins are unclear, legal scholars agree that several States had adopted it by the late 1800s. See W. Stoebuck, Opinions on Ultimate Facts: Status, Trends, and a Note of Caution, 41 Denver L. Ctr. J. 226, 226–227 (1964) (Stoebuck) ("The mist the gods drew about them on the battlefield before Troy was no more

dense than the one enshrouding the origins of the [ultimate-issue] rule"). The rule was short lived though, and courts and commentators came to doubt its propriety within a matter of decades. See *ibid.* Many rejected the idea that ultimate-issue testimony usurps the jury's role, since a witness's "credibility" and "the soundness of his judgment" "always remain for the jury's determination." *Goldfoot* v. *Lofgren*, 135 Ore. 533, 541, 296 P. 843, 847 (1931). Others labeled the rule "impracticable and misconceived" because it excluded "the most necessary testimony" on issues where "the jury should have help if it is needed." 7 Wigmore 18–19. By the 1940s, "a trend [had] emerged to abandon" the rule altogether. 1 McCormick 80. It soon became unclear whether, and to what extent, the ultimate-issue rule carried any force. See Stoebuck 236.

Rule 704 made clear that the ultimate-issue rule did not apply in federal courts. When Rule 704 was originally adopted in 1975, it had no exceptions: All ultimate-issue opinions were permitted. 88 Stat. 1937.

About nine years later, in the wake of the John Hinckley, Jr., trial, Congress created the exception now found in Rule 704(b). On March 30, 1981, Hinckley attempted to assassinate President Ronald Reagan, shooting and wounding the President and three other men. See L. Caplan, The Insanity Defense and the Trial of John W. Hinckley, Jr., 7–9 (1984). At his criminal trial, Hinckley claimed that he was insane. Both the prosecution and defense offered competing expert opinions on the ultimate issue of Hinckley's sanity. See R. Bonnie, J. Jeffries, & P. Low, A Case Study in the Insanity Defense 54 (4th ed. 2021). To the surprise of many, Hinckley was found not guilty by reason of insanity. See *id.*, at 133; R. Slovenko, The Insanity Defense in the Wake of the Hinckley Trial, 14 Rutgers L. J. 373 (1982). Congress adopted Rule 704(b) shortly thereafter to carve out an "exception" to Rule 704's blanket rule admitting ultimate-issue opinions. As Rule 704(b) now reads, "[i]n a criminal case,

an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."

By its terms, Rule 704(b)'s exception covers a narrow set of opinions. The exception does not apply in civil cases or affect lay witness testimony. And, it exclusively addresses mental states and conditions that are "element[s] of the crime charged or of a defense." Rule 704(b) thus proscribes only expert opinions in a criminal case that are about a particular person ("the defendant") and a particular ultimate issue (whether the defendant has "a mental state or condition" that is "an element of the crime charged or of a defense").

## III

Rule 704(b) applies only to opinions about the defendant. Because Agent Flood did not express an opinion about whether Diaz herself knowingly transported methamphetamine, his testimony did not violate Rule 704(b).

Agent Flood instead testified about the knowledge of *most* drug couriers. Specifically, he explained that "in most circumstances, the driver knows they are hired . . . to take the drugs from point A to point B." App. to Pet. for Cert. 15a. That opinion does not necessarily describe Diaz's mental state. After all, Diaz may or may not be like most drug couriers. Diaz herself made this point at trial. She argued that another person, an alleged boyfriend, had deceived her into carrying the drugs.[2] During opening statements, Diaz's counsel explained that Diaz met her boyfriend while she was "broken-hearted over the death of her mother" and recovering from "a debilitating back injury." Trial Tr., ECF Doc. 112, pp. 140–141. Diaz's boyfriend "took advantage" of those circumstances to lure Diaz to Mexico. *Id.*, at 140. As

---

[2] Though Diaz later admitted the boyfriend never existed, she maintained her story throughout the trial. N. 1, *supra.*

her counsel described it, the boyfriend then loaned Diaz a car that was secretly loaded with drugs for her drive back to the United States. Diaz supported that story during her case in chief. She presented an automobile mechanics expert who testified that there was "no way for someone to suspect or know that there was drugs hidden within th[e] car." Trial Tr., ECF Doc. 113, p. 62. Diaz also challenged the Government's contrary theory. On cross-examination, Diaz's counsel highlighted that Agent Flood was not involved in Diaz's case and that the Government itself was aware of cases involving unknowing couriers.

The jury was thus well aware that unknowing couriers exist and that there was evidence to suggest Diaz could be one of them. It simply concluded that the evidence as a whole pointed to a different conclusion: that Diaz knowingly transported the drugs. The jury alone drew that conclusion. While Agent Flood provided evidence to support one theory, his testimony was just that—evidence for the jury to consider or reject when deciding whether Diaz in fact knew about the drugs in her car. Because Agent Flood did not give an opinion "about whether" Diaz herself "did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," his testimony did not violate Rule 704(b).

Diaz's counterarguments, echoed by the dissent, are not persuasive. Diaz and the dissent argue that Agent Flood "functional[ly]" stated an opinion about whether Diaz knowingly transported drugs when he opined that couriers generally transport drugs knowingly. Brief for Petitioner 24 (internal quotation marks omitted); see also *post*, at 549 (opinion of GORSUCH, J.). That argument mistakenly conflates an opinion about *most* couriers with one about *all* couriers. A hypothetical helps explain why this distinction matters under Rule 704(b). Take for example an expert who testifies at an arson trial that all people in the defendant's shoes set fires maliciously (the mental state required

for common-law arson). Although the expert never spoke the defendant's name, the expert nonetheless violated Rule 704(b). That is because the expert concluded that the defendant was part of a group of people that all have a particular mental state. The phrase "all people in the defendant's shoes" includes, of course, the defendant himself. So, when the expert testified that all people in the defendant's shoes always set fires with malicious intent, the expert also opined that the defendant had that mental state. The expert thus stated an opinion on the defendant's mental state, an ultimate issue reserved for the jury, in violation of Rule 704(b).

Here, by contrast, Agent Flood asserted that Diaz was part of a group of persons that *may or may not* have a particular mental state. Of all drug couriers—a group that includes Diaz—he opined that the majority knowingly transport drugs. The jury was then left to decide: Is Diaz like the majority of couriers? Or, is Diaz one of the less-numerous-but-still-existent couriers who unwittingly transport drugs? The ultimate issue of Diaz's mental state was left to the jury's judgment. As a result, Agent Flood's testimony did not violate Rule 704(b).

Diaz and the dissent next zero in on the word "about" in Rule 704(b). They rely on dictionary definitions of "about" to argue that Rule 704(b)'s prohibition includes all testimony that "'concerns' or is 'in reference to' whether the defendant possessed a particular state of mind." Brief for Petitioner 18–19; *post*, at 548. But, a word's meaning is informed by its surrounding context. See *Smith* v. *United States*, 508 U. S. 223, 233 (1993). A crucial part of that context is the other words in the sentence. See *FCC* v. *AT&T Inc.*, 562 U. S. 397, 405 (2011). The words surrounding "about" make clear that Rule 704(b) addresses a far narrower category of testimony than Diaz and the dissent posit. To begin, the Rule targets "opinion[s]." In other words, the testimony must be more than a general reference, and it must reach

a particular conclusion. See Black's Law Dictionary 1244 (rev. 4th ed. 1968) (defining "opinion evidence" as "what the witness thinks, believes, or infers in regard to facts in dispute"). Moreover, the Rule does not preclude testimony "about" mental-state ultimate issues in the abstract. Instead, it targets conclusions "about whether" a certain fact is true: "[T]he defendant did or did not have a mental state or condition." The language as a whole thus conveys that Rule 704(b) is limited to conclusions as to the defendant's mental state.

Rule 704(a) further confirms the narrow scope of testimony prohibited by Rule 704(b). Recall that the original ultimate-issue rule excluded opinions on the ultimate issue itself. See *supra*, at 531–532. Rule 704(a) abolished that practice by permitting testimony that "embraces an ultimate issue." See 5 Oxford English Dictionary 169 (2d ed. 1989) (defining "embrace" as "[t]o include, contain, comprise"). Because Rule 704(b) is an "exception" to Rule 704(a), it can only be understood to cover a subset of the testimony that Rule 704(a) expressly allows. In short, since Rule 704(a) permits opinion testimony that includes ultimate issues, Rule 704(b) must exclude only a subset of those same opinions.

The reading offered by Diaz and the dissent would have the exception swallow the rule. If Rule 704(b) were as broad as they suggest, it would be a standalone prohibition broader than Rule 704(a)—or even the original ultimate-issue rule. Even though the ultimate-issue rule and Rule 704(a) address opinions that include the ultimate issue itself, Rule 704(b) would prohibit all opinions even related to the ultimate issue of a defendant's mental state. Rule 704's text does not support such an expansion. The Rule as a whole makes clear that an opinion is "about" the ultimate issue of the defendant's mental state only if it includes a conclusion on that precise topic, not merely if it concerns or refers to that topic.

## IV

An expert's conclusion that "most people" in a group have a particular mental state is not an opinion about "the defendant" and thus does not violate Rule 704(b). Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE JACKSON, concurring.

I join the Court's opinion in full. Federal Rule of Evidence 704(b) forbids expert witnesses in criminal trials from offering their "opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." As the Court explains, Rule 704(b) is narrow. Against the backdrop of Federal Rules that authorize admission of all relevant evidence, it prohibits "only expert opinions . . . about a particular person ('the defendant') and a particular ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense')." *Ante*, at 534. But, as narrow as it is, Rule 704(b) strikes a very important balance: It allows for potentially highly probative expert testimony to be submitted to the jury, while leaving "[t]he ultimate issue of [the defendant's] mental state . . . to the jury's judgment." *Ante*, at 536.

I write separately to emphasize that, as Congress designed it, Rule 704(b) is party agnostic. Neither the Government nor the defense can call an expert to offer her opinion about whether the defendant had or did not have a particular mental state at the time of the offense. See *ante*, at 534. But a corollary is also true. Both the Government and the defense are permitted, consistent with Rule 704(b), to elicit expert testimony "on the likelihood" that the defendant had a particular mental state, "based on the defendant's membership in a particular group." Brief for John Monahan et al. as *Amici Curiae* 1 (Evidence Professors Brief). Indeed, the

type of mental-state evidence that Rule 704(b) permits can prove essential not only for prosecutors, but for defendants as well.

I

This very case illustrates the significance of mental-state evidence to both parties in a criminal trial. The Government expert opined (based on his almost 30 years of experience as a special agent) that, "in most circumstances," drug couriers know that they are transporting drugs. App. to Pet. for Cert. 10a, 15a. Diaz challenged this testimony, and, today, the Court holds that the Government did not violate Rule 704(b). See *ante*, at 534. Notably, however, the Government was not the only party that relied on this type of mental-state evidence during the trial. Diaz called an automobile specialist who testified that a driver of her particular car would almost certainly *not* know that it contained drugs. See Supp. Excerpts of Record in No. 21–50238 (CA9), pp. 139–159. That type of evidence is permissible under the interpretation of Rule 704(b) the Court adopts today.* Moreover, as the dissent observes, Diaz might have opted to introduce other types of expert evidence related to the mental-state element. See *post*, at 551–552 (opinion of GORSUCH, J.). For example, Diaz could have offered expert testimony on the prevalence and characteristics of unknowing drug couriers. See Tr. of Oral Arg. 24; see also Brief for National Association of Federal Defenders as *Amicus Curiae* 5–16 (NAFD Brief) (describing numerous cases involving so-called "blind mules").

For the reasons described in today's opinion, none of that evidence would deprive the jury of its ability to decide the last link in the inferential chain: whether Diaz herself had the requisite *mens rea*. But, at the same time, having all of

---

*Before this Court, Diaz forthrightly admits that such evidence would be impermissible under the dissent's interpretation of Rule 704(b). See Reply Brief 8; Tr. of Oral Arg. 27.

this testimony might have helped the jury determine whether the Government had met—or failed to meet—its burden of proving that Diaz knew of the drugs found in her car. Thus, far from disserving our criminal justice system, see *post,* at 552, the type of mental-state evidence that Rule 704(b) permits can be of critical assistance to lay factfinders tasked with determining a defendant's mental state as an element of the alleged crime (or defense).

Other examples provide further proof. Consider expert evidence on mental health conditions. Congress crafted Rule 704(b) to prohibit experts from opining on a particular defendant's mental state at the time of an offense, but it did not preclude experts from contextualizing a defendant's mental health condition, including by explaining the likelihood that those with a particular condition would have a particular mental state. For example, as Diaz acknowledges, the interpretation of Rule 704(b) the Court adopts today "allow[s] psychiatrists who testify as experts to . . . tell the jury that when people with schizophrenia as severe as [a] defendant's commit acts of violence, it is generally because they do not appreciate the wrongfulness of their conduct." Brief for Petitioner 21–22; see also Brief for United States 35–36. That type of expert evidence would not result in the spectacle of dueling experts on the defendant's actual mental state, which Congress sought to eliminate when it codified Rule 704(b). See *ante,* at 533–534; see also S. Rep. No. 98–225, p. 230 (1983). Instead, given the biases, stereotypes, and uneven knowledge that many people have about mental health conditions, such expert evidence could help jurors better understand a defendant's condition and thereby call into question a *mens rea* that might otherwise be too easily assumed. See, *e. g., United States* v. *Brown,* 32 F. 3d 236, 239 (CA7 1994); *United States* v. *Thigpen,* 4 F. 3d 1573, 1579–1580 (CA11 1993) (en banc).

Or consider defendants who have been subject to domestic abuse. "A number of myths and misconceptions about [battered woman syndrome] victims affect our criminal justice

JACKSON, J., concurring

system," and it is clear that those mistaken views "affect jurors." *Linn* v. *State*, 929 N. W. 2d 717, 742 (Iowa 2019); see also *id*., at 742–746 (summarizing relevant evidence). Rule 704(b) allows experts to testify about the typical mental states of those with battered woman syndrome, helping jurors to better understand how those experiencing it respond to aggression or react to violence.   See Evidence Professors Brief 25; see also 29 C. Wright & V. Gold, Federal Practice and Procedure § 6285 (2d ed. Supp. 2023).   Such evidence can play a pivotal role in a defendant's attempts both to disprove the *mens rea* in a number of serious crimes and to support a range of defenses, including duress and self-defense.   See, *e. g.*, *United States* v. *Lopez*, 913 F. 3d 807, 819–824 (CA9 2019); *United States* v. *Nwoye*, 824 F. 3d 1129, 1136–1138 (CADC 2016).

## II

All that said, I fully acknowledge that there are serious and well-known risks of overreliance on expert testimony— risks that are especially acute in criminal trials.   See NAFD Brief 21–22, 24–25; see also *United States* v. *Alvarez*, 837 F. 2d 1024, 1030 (CA11 1988) ("When the expert is a government law enforcement agent testifying on behalf of the prosecution about participation in prior and similar cases, the possibility that the jury will give undue weight to the expert's testimony is greatly increased").   But there are also safeguards outside of Rule 704(b) to prevent the misuse of expert testimony.   Nothing in the Court's opinion today should be read to displace those important checks and limitations.

This means, of course, that when faced with flawed or faulty testimony concerning the mental states of groups or categories of individuals, parties can utilize the traditional tools in a lawyer's toolkit, like vigorous cross-examination and careful refutation in closing argument.   Parties can also seek to employ other Rules of Evidence that might require exclusion—those that guard against irrelevant or unduly prejudicial testimony, for example, and those that require

courts to bar unqualified or overreaching experts. See Fed. Rules Evid. 401, 402, 403, 702; see also, *e. g.*, *United States* v. *Finley*, 301 F. 3d 1000, 1014–1015 (CA9 2002) ("Expert testimony that compels the jury to conclude that the defendant did or did not possess the requisite *mens rea* does not 'assist the trier of fact' under Rule 702 because such testimony encroaches on the jury's vital and exclusive function to make credibility determinations"); *United States* v. *Lipscomb*, 14 F. 3d 1236, 1242 (CA7 1994) (describing safeguards that can be used to prevent testimony from law enforcement experts from unduly prejudicing a defendant).

District court judges also have a role to play. They should be protective of Congress's intent to preserve the jury's core duty, by providing specific admonitions and instructions when expert testimony about a relevant mental state is introduced. See Evidence Professors Brief 27–29; see also *United States* v. *Smart*, 98 F. 3d 1379, 1388–1389 (CADC 1996) (requiring that district courts sometimes use jury instructions to prevent expert testimony from violating Rule 704(b)).

With this understanding of both the important uses and the potential misuses of Rule 704(b), I join the Court's opinion.

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

Federal Rule of Evidence 704(b) prohibits an expert witness from offering an opinion "about whether the defendant did or did not have [the] mental state" needed to convict her of a crime. "Those matters," the Rule instructs, "are for the trier of fact alone." Following the government's lead, the Court today carves a new path around that command. There's no Rule 704(b) problem, the Court holds, as long as the government's expert limits himself to testifying that *most* people like the defendant have the mental state required to secure a conviction.

The upshot? The government comes away with a powerful new tool in its pocket. Prosecutors can now put an expert on the stand—someone who apparently has the convenient ability to read minds—and let him hold forth on what "most" people like the defendant think when they commit a legally proscribed act. Then, the government need do no more than urge the jury to find that the defendant is like "most" people and convict. What authority exists for allowing that kind of charade in federal criminal trials is anybody's guess, but certainly it cannot be found in Rule 704.

I

Delilah Diaz's conviction for drug trafficking turned on her state of mind. In that, hers was an everyday case. Often in our criminal justice system, the difference between freedom and years in prison turns on just that question. Perhaps it has always been so. The government's duty to prove that the defendant it seeks to convict had a culpable state of mind when committing a proscribed act is as ancient as it is fundamental to our system of justice. At common law, "a complete crime" generally required "both a will" (or *mens rea*) "and an act" (or *actus reus*). 4 W. Blackstone, Commentaries on the Laws of England 21 (1769) (Blackstone). That same view "took deep and early root in American soil" where, to this day, a crime ordinarily arises "only from concurrence of an evil-meaning mind with an evil-doing hand." *Morissette* v. *United States*, 342 U. S. 246, 251–252 (1952); see 1 J. Bishop, Commentaries on the Criminal Law §291, p. 163 (6th ed. 1877) (Bishop). So ingrained is this view that courts have long presumed criminal statutes demand proof of *mens rea* even when they are "silent" on the subject. *Morissette*, 342 U. S., at 252; see *Staples* v. *United States*, 511 U. S. 600, 605 (1994).

Why does our law generally insist not just on a bad act but also a culpable state of mind? A significant part of it has to do with respect for the individual and his liberty in a

free society. "Criminal liability imports a condemnation, the gravest we," as a Nation, "permit ourselves to make." H. Wechsler, American Law Institute II–A Thoughtful Code of Substantive Law, 45 J. Crim. L. & C. 524, 528 (1955) (Wechsler); see also 4 Blackstone 20–21; 1 Bishop § 287, at 161. Of course, our law recognizes gradations of *mens rea*, ranging from purpose and knowledge to recklessness and negligence. See, *e. g.*, ALI, Model Penal Code § 2.02 (1985); *United States* v. *Bailey*, 444 U. S. 394, 404 (1980). But to subject a presumptively free individual to serious punishments for acts undertaken without proof of any of that would be "the badge of tyranny, the plainest illustration of injustice." Wechsler 528. The principle "that an injury can amount to a crime only when inflicted" with some accompanying *mens rea* is, we have said, "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette*, 342 U. S., at 250.

At trial, deciding whether a criminal defendant acted with a culpable mental state is a job for the jury. No matter how "clear the proof" or "incontrovertible" the inference, the question whether a defendant possessed a culpable *mens rea* "must always be submitted to the jury." *Id.*, at 274 (internal quotation marks omitted). Always, too, the government bears the burden of proving the requisite *mens rea*. Never, we have held, may the government seek to "shift the burden of proof to the defendant." *Patterson* v. *New York*, 432 U. S. 197, 215 (1977); see *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975). Nor may a court instruct a jury that it must presume a defendant's state of mind from any particular set of facts, no matter how compelling they may be. *Francis* v. *Franklin*, 471 U. S. 307, 316 (1985).

Reflecting the centrality of *mens rea* to criminal punishment and the jury's role in finding it, Rule 704(b) of the Fed-

GORSUCH, J., dissenting

eral Rules of Evidence provides that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."  As the Rule continues: "Those matters are for the trier of fact alone."

By all accounts, the immediate impetus for the Rule was the trial of John Hinckley for the attempted assassination of President Ronald Reagan.  *Ante*, at 533.  In that case, experts didn't just offer competing views on whether Hinckley suffered from a medically diagnosable mental illness. They went much further.  The trial descended into a battle between experts who claimed to know exactly what Hinckley was (or was not) thinking at the moment he pulled the trigger.  *Ibid.*

In the trial's aftermath, Congress continued to recognize the value of expert mental health evidence.  So, for example, an expert may still testify that the defendant suffered from some diagnosable illness or syndrome at the time of the charged act and discuss its symptoms.  Cf. *ante*, at 540–541 (JACKSON, J., concurring) (discussing schizophrenia and battered woman syndrome).  From testimony like that, a jury might infer that the defendant did not have the requisite mental state to convict.  But in Rule 704(b) Congress declared that task belonged to the jury alone, and allowing a parade of witnesses to speculate about what did or did not transpire in the head of a particular defendant at a particular moment in the past did not reflect well on federal judicial proceedings and did not aid the jury.

Rule 704(b) may have been a new addition to the Federal Rules of Evidence, but it reflects a much older tradition. For centuries, courts have grappled with the role expert witnesses should play at trial.  See, *e. g.*, 1 S. Greenleaf, Evidence § 440, p. 489 (1842); *Folkes* v. *Chadd*, 3 Dougl. 157, 158–159, 99 Eng. Rep. 589, 590 (K. B. 1782).  For a long stretch,

many courts barred experts from offering opinions on so-called ultimate issues like *mens rea*.   See 3 J. Wigmore, Evidence §§ 1920, 1921 (1904); *United States* v. *Spaulding*, 293 U. S. 498, 506 (1935).   The Federal Rules of Evidence are no longer so strict, see Fed. Rule Evid. 704(a), except in one respect: *mens rea*.   On that particular issue, Congress has concluded that jurors need no help from experts.   They are fully capable of drawing reasonable inferences from the facts and deciding whether the defendant acted with the requisite *mens rea.*   And in criminal trials that is their job alone.

## II

The government violated that Rule in this case.   Proceedings began when prosecutors charged Ms. Diaz with importing a controlled substance into this country.   See 21 U. S. C. §§ 952, 960(a)(1).   At the trial that followed, Ms. Diaz did not dispute that she had transported drugs across the border. The only question concerned her *mens rea.*   If, as the government charged, she transported the drugs "knowingly," she faced a potential sentence of up to life in prison.   See §§ 960(a)(1), (b)(1)(H).   If, however, Ms. Diaz acted with some lesser *mens rea* (say, negligence), or perhaps innocently (as what some call a "blind mule"), she was entitled to an acquittal.

To help prove that Ms. Diaz "knowingly" imported drugs, the government called to the stand Andrew Flood, one of its own employees, an agent with the Department of Homeland Security.   Ms. Diaz had made no admissions to him about her mental state, nor had Agent Flood even interviewed her. Instead, prosecutors called Agent Flood as an expert on the minds of drug couriers (yes, really).   App. 17; United States' Notice in No. 3:20–cr–02546 (SD Cal.), ECF Doc. 30, p. 7. And in response to the government's questions, Agent Flood testified that, "in most circumstances, the driver knows they are hired . . . to take the drugs from point A to point B." App. to Pet. for Cert. 15a.

GORSUCH, J., dissenting

That was a violation of Rule 704(b), plain as day. Just walk through its terms. The government called Agent Flood as an "expert witness" to address the question "whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged." After all, whether Ms. Diaz acted "knowingly" was the only question at trial, all that separated her from a conviction. And Agent Flood proceeded to do just as he was asked, offering an "opinion about" that very question.

To be sure, prosecutors thought they had a clever way around the problem. They did not ask Agent Flood to testify explicitly about Ms. Diaz's mental state. Instead, they asked the agent to testify about the mental state of people exactly like Ms. Diaz, drivers bringing drugs into the country. And that, the prosecutors argued, made all the difference. See App. 32a; Brief for United States in No. 21–50238 (CA9), pp. 46, 58. The Ninth Circuit endorsed the government's maneuver, holding that Rule 704(b) prohibits only testimony " 'explicit[ly]' " about the defendant's mental state, not testimony about the mental state of a class of persons that includes her. App. to Pet. for Cert. 6a (quoting *United States* v. *Gomez*, 725 F. 3d 1121, 1128 (CA9 2013)).

Before us, however, even the government disavows the full implications of that reasoning. Now, it concedes, the Rule does more than bar an expert from testifying "explicitly" that the defendant had the mental state required for conviction. Tr. of Oral Arg. 72–73, 76. The Rule also bars an expert from testifying that a class of persons (say, all people carrying drugs over the border) has the legally proscribed mental state when that class includes the defendant. Brief for United States 36; *ante*, at 535–536. Likewise, the Rule bars an expert from opining that a hypothetical person who matches the defendant's description (say, a hypothetical woman who drives a car full of drugs across the border) will have the mental state required for conviction. Tr. of Oral Arg. 67. All those opinions, the government now acknowledges, are

"about" the defendant's mental state and cannot be offered consistent with Rule 704(b).   On this, the Court, too, agrees. *Ante*, at 535–536.

## III

So what is left?   Instead of vacating and remanding the case to the Ninth Circuit to correct its error, the government asks us to affirm its judgment on other grounds.   As the government sees it, Agent Flood's opinion was permissible for a different reason than the Ninth Circuit offered.   It was permissible, the government says, because it wasn't *definitive*.   So, yes, an expert cannot testify that *all* persons in a class that includes the defendant have a culpable mental state.   Brief for United States 36.   But, the government insists, everything changes when an expert offers (as Agent Flood offered) only a *probabilistic* assessment that *most* such persons do.

I cannot see how that gambit begins to solve the government's problem.   The Rule does not only prohibit an expert from stating a *definitive* opinion about the defendant's mental state (or, as the government concedes, the mental state of a class that includes her).   It prohibits an expert from offering *any* opinion on the subject.   Return, once more, to the Rule's terms.   It bars an expert from stating an opinion "*about* whether the defendant" had "a mental state . . . that constitutes an element of the crime charged."   (Emphasis added.)   The word "about" means "[c]oncerning, regarding, with regard to, in reference to; in the matter of."   Oxford English Dictionary (3d ed., June 2024); see Brief for Petitioner 18; see also American Heritage Dictionary 5 (def. 4a) (5th ed. 2011).   So whether an expert's opinion happens to be definitive or probabilistic makes no difference.   An expert may not state any opinion concerning, regarding, or in reference to whether the defendant, while committing a charged criminal act, had the requisite mental state to convict.   Period.   Lest any doubt remain, the Rule takes

pains to emphasize, "[t]hose matters are for the trier of fact alone."

Consider, too, how the government's present theory collapses into the one it has disavowed. Just imagine if Agent Flood had explicitly addressed Ms. Diaz and said she "most likely knew" she was carrying drugs. Would that testimony be permissible under Rule 704(b)? Of course not. Probabilistic though the testimony may be, an expert who says that an individual defendant "most likely" had the requisite mental state for conviction offers an opinion about, concerning, regarding, or in reference to her mental state. On that, no dispute exists. So how can it be, as the government insists, that an expert may offer the probabilistic assessment that "most" people like the defendant know they are carrying drugs? The only difference between the two opinions is that the first addresses the defendant "explicitly," the second a class that includes her. All of which returns us to a distinction that the government itself seems to acknowledge the Rule does not tolerate.

Observe, as well, where today's tiptoeing around the Rule promises to lead. The Court adopts the government's muddled view that an expert cannot offer a probabilistic opinion about the mental state of the defendant explicitly but can offer a probabilistic opinion about the mental state of a group that includes the defendant. So what happens next? In this case, Agent Flood said "most" people in the defendant's shoes have the requisite *mens rea*. But what if he said, as the government initially proffered, that drivers "generally" know? ECF Doc. 30, at 7. Or that they "almost always" know? Or perhaps an expert puts a finer point on it: "In my experience, 99% of drug couriers know." When cases like those come to us, likely one of two things will happen. We will draw some as-yet unknown line and say an expert's probabilistic testimony went too far. Or we will hold anything goes and eviscerate Rule 704(b) in the process.

Rather than face either of those prospects, how much easier it would be to follow where the Rule's text leads.

## IV

The government's approach, adopted by the Court today, is no more necessary than it is appropriate. Yes, proving a defendant's mental state at trial can require work. Normally, it will require the government to resort to circumstantial evidence and inference. After all, defendants in life do not confess their inner thoughts on the stand nearly as often as they do in courtroom dramas. But there is nothing new about any of that. See 4 Blackstone 21 ("no temporal tribunal can search the heart, or fathom the intentions of the mind, otherwise than as they are demonstrated by outward actions"). Nor is it any secret that the government has a long track record of success in proving *mens rea* the old-fashioned way by presenting circumstantial evidence and appealing to reasonable inferences.

This case illustrates how it can be—and regularly is—done. To persuade the jury that Ms. Diaz knew about the drugs, the government could point to the amounts involved— 54 pounds of drugs worth over $360,000. *Ante*, at 529. It could also point to the holes in her story. She claimed the car was her boyfriend's, but then said she had met him only "three times tops," did not know his phone number, and did not know where he lived. ECF Doc. 33–1, at 13, 32. The government could point out, too, that when cell phones were found in the car, Ms. Diaz maintained one of them belonged to a friend, someone she would "rather not" identify. *Id.*, at 34. As well, the government could highlight her statement that the phone was "locked" and she did not "have access to it." *Id.*, at 32–33. And the government could then ask a jury to infer from all these facts that Ms. Diaz knew exactly what she was doing. As it argues to us, the government was free to argue to a jury, asking it to conclude that Ms. Diaz's story was "transparently flimsy." Brief in Opposition

GORSUCH, J., dissenting

16. Day in and day out, the government secures convictions for the knowing importation of drugs in just this way. Tr. of Oral Arg. 84. There was no need to gild the lily by calling to the stand an "expert" in mindreading. And there is certainly no cause for this Court to sanction the practice.

To the contrary, there are sound reasons why Rule 704(b) operates as it does. The problem of junk science in the courtroom is real and well documented. See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 589–590 (1993); *Kumho Tire Co.* v. *Carmichael*, 526 U. S. 137, 147 (1999); see also P. Huber, Galileo's Revenge: Junk Science in the Courtroom 15–17 (1991). And perhaps no "science" is more junky than mental telepathy. After Hinckley's trial, Congress recognized as much when it adopted Rule 704(b) to remove from federal courtrooms experts who claim to know what was inside a man's head at a particular moment in the past when he committed a particular act.

The particular nook of the criminal law we find ourselves in today illustrates the soundness of Congress's approach. Not long ago, the government tried—often successfully—to put "experts" (really, like Agent Flood, its own law enforcement agents) on the stand to testify that *all* couriers know when they are carrying drugs. See, *e. g.*, *United States* v. *Flores*, 510 Fed. Appx. 594, 595 (CA9 2013). Not only was that testimony improper under the government's own current understanding of Rule 704(b). See Part II, *supra*; *ante*, at 535–536. Eventually, the government felt it had to backtrack after being confronted with too much evidence that some couriers simply have no idea they are being used to carry drugs. *Flores*, 510 Fed. Appx., at 595. So now, the government puts on witnesses to say *most* couriers know. We cannot be certain how many individuals sit in federal prison because of the government's past impermissible and mistaken "expert" testimony that *all* couriers know when they are carrying drugs. About the only thing we can be sure of is that what is good for the goose is good for the gander and

that, thanks to the Court's opinion today, defendants will now recruit their own warring experts. Ones who will seek to testify (not unlike Agent Flood) that, in their experience, "most" drug couriers are kept in the dark by cartels.

None of this serves our criminal justice system well. A criminal conviction is "the gravest" condemnation we as a society "permit ourselves to make." Wechsler 528. Allowing into our proceedings speculative guesswork about a defendant's state of mind diminishes the seriousness due them. It risks the reliability of the outcomes they produce (just ask those convicted in cases where government experts opined that "all" couriers know). It undermines our historic commitment that *mens rea* is a necessary component of every serious crime by turning the inquiry into a defendant's mental state from an exacting one guided by hard facts and reasonable inferences into a competing game of "I say so." It diminishes our respect for the presumptively free person, his free will and individuality, by encouraging the lazy assumption that he thinks like "most." And it reduces the vital role juries are meant to play in criminal trials. Yes, they can still decide whether the defendant thinks like "*most*" people. *Ante*, at 535. But that role hardly matches Rule 704(b)'s promise that "matters" of *mens rea* at trial belong to the jury "alone."

V

In describing what I see as some of the possible consequences of the government's approach adopted by the Court today, I do not mean to suggest they are inevitable. Today's decision may go a long way toward hollowing out Rule 704(b). But it does not address what any other Rule of Evidence may have to say about cases like this one. And, looking briefly to some of those other Rules, I see reason for hope.

Take a few examples. Under Rule 402, any evidence presented at trial must be "[r]elevant," meaning it must have a "tendency to make . . . more or less probable" a "fact . . . of

consequence in determining the action." Fed. Rules Evid. 401, 402. Yet, if the government is right that an expert opinion about the mental state of "most" people like the defendant is *not* "about" the defendant's mental state, it is hard to see how that opinion might be relevant. After all, the "fact of consequence" in cases like Ms. Diaz's is whether the defendant possessed the requisite *mens rea*. And it's hard to see how the government can have it both ways—asserting in one breath that opinions like Agent Flood's are *not* "about" whether the defendant possessed the requisite mental state to convict, while insisting in the next breath that those opinions *are* relevant to (or, one might say, "about") the defendant's mental state.

Rule 403 stands as another bulwark. That Rule permits courts to "exclude relevant evidence" when its "probative value is substantially outweighed by a danger of . . . unfair prejudice." Surely, in our system of justice—where we recognize that each individual is presumed innocent and distinctly endowed with free will and choice, where the individual is responsible for his culpable mental states but not those of others—testimony about what "most" people think bears minimal probative value when the question at issue is what *this* individual thinks. Nor can the kind of testimony offered here hold much probative value when juries, composed of the defendant's peers, are well suited to resolve questions of *mens rea* without "expert" assistance. Juries have managed that task for centuries and, as we have long recognized, they are "fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Aetna Life Ins. Co.* v. *Ward*, 140 U. S. 76, 88 (1891).

Meanwhile, the danger of unfair prejudice can run very high. It can be "difficult for the individual to make his own case stand on its own merits in the minds of the juror[s]" when jurors are told by an expert "that birds of a feather are flocked together." *Krulewitch* v. *United States*, 336 U. S. 440, 454 (1949) (Jackson, J., concurring). As this Court

has recognized, too, expert opinions about the defendant's "state of mind at the crucial moment" when committing a criminal act may "easily mislead" the jury into "thinking the opinions show more than they do." *Clark* v. *Arizona*, 548 U. S. 735, 776 (2006). Even the government candidly admits Rule 403 challenges may be proper against such testimony. Brief for United States 30–31.

The risk of unfair prejudice can be exacerbated, too, where, as here, the professed expert "carries with [him] the imprimatur of the [g]overnment." *United States* v. *Young*, 470 U. S. 1, 18 (1985). A witness like that "may induce the jury to trust [the witness's] judgment rather than its own view of the evidence." *Id.*, at 18–19; see also *United States* v. *Scheffer*, 523 U. S. 303, 314 (1998) (plurality opinion) (experts like these may attain an "aura of infallibility"). For precisely that reason, the government may be highly tempted to do as it did in this case and seek to throw in an "expert" on top of a seemingly strong circumstantial case—just to be sure. But none of that means the proffered testimony is likely to advance the promise of a fair trial.

Add to those Rules at least one more. As part of its "gatekeeping" functions, a federal court must ensure that any expert testimony it permits is reliable, grounded on widely accepted principles, and will "'assist the trier of fact to understand the evidence.'" *Kumho Tire Co*, 526 U. S., at 147 (quoting Fed. Rule Evid. 702(a) (1999)). I struggle to see how a witness claiming to offer an opinion about another person's (or class of persons') thoughts at a particular moment in the past can meet any of those standards. No one, at least outside the fortuneteller's den, can yet claim the power to conjure reliably another's past thoughts. Testimony like Agent Flood's may be dubiously circular, too. For each time a law enforcement agent takes the stand to say "most people know" and that helps the government secure another conviction, he himself is creating the very proof on

which a government expert may purport to rely in the next trial.

Nor does testimony like that help the jury understand "'experience[s] confessedly foreign in kind to [its] own.'" *Kumho Tire Co.*, 526 U. S., at 149 (quoting L. Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)). In a criminal trial, expert testimony about DNA testing or the chemical composition of illegal drugs may sometimes help a jury understand facts they do not encounter in daily life. But none of that holds true when it comes to the job of assessing whether a defendant's story about her state of mind is credible or (as the government puts it) "transparently flimsy." Brief in Opposition 16. Jurors are more than up to performing that task, and they hardly need the help of some clairvoyant.

\*

Persuaded that today's decision is mistaken, but hopeful that it will ultimately prove immaterial in practice, I respectfully dissent.

## REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None