**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kenneth Sydney WHITE Defendant–
Appellant.**

No. 01–5270.

United States Court of Appeals,
Sixth Circuit.

Jan. 20, 2003.

Before BOGGS and GUY, Circuit Judges; and EDMUNDS, District Judge.*

PER CURIAM.

Kenneth Sydney White was charged in a two-count indictment with conspiracy to possess with intent to distribute and distributing in excess of 100 kilograms of marijuana in a conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), 846, and possession with intent to distribute and distributing approximately 1085.17 pounds of marijuana and aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. During the trial, at the close of the Government's proofs, White made a Rule 29 motion for acquittal, which was subsequently denied by the district judge. The jury found him guilty. White now appeals the district court's judgment, arguing that the court erred in denying his motion for acquittal and alternatively that he is entitled to a reversal of his conviction and a new trial on the basis of prosecutorial misconduct. We affirm the district court's denial of White's motion for acquittal. In addition, although there was prosecutorial misconduct in this case, the defense counsel failed to object in a timely manner and the misconduct was not sufficiently flagrant to render White's trial fundamentally unfair. We therefore affirm White's conviction.

**I**

In October 1994, over a thousand pounds of marijuana packed underneath a shipment of watermelons was delivered by truck from Texas to Savannah, Tennessee,

---

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

where it was intercepted by the police. The government claims that Kenneth White, the owner of the truck, was a co-conspirator, involved in the transportation of the marijuana. White claims that it was his son, Keith White (Keith), who was involved in smuggling the drugs and that he was an unwitting participant in the event, involved only in the legitimate business of shipping produce.

On October 14, 1994, John Alexander, a deputy sheriff with the Hardeman County Sheriff's Department was dispatched to investigate an eighteen-wheel truck that had collided with the corner of a local motel: the River Plantation Inn (Plantation Inn) in Savannah, Tennessee. Officer Alexander stopped the driver of the vehicle, Frank Arnold, and, with the help of a drug-sniffing dog, discovered marijuana in the trailer beneath several boxes of watermelons. As far as officer Alexander can remember, another officer who went to the Plantation Inn was able to identify White as the owner of the vehicle, and subsequently brought White and his son, Keith, to where the police were unloading the marijuana from the vehicle. A bill of lading found in the tractor-trailer identified White as the "carrier" and Keith as the "driver." Both parties stipulated to the fact that marijuana was removed from a trailer owned by the defendant, White, which was being pulled by a tractor owned by Keith and driven by Arnold. Officer Alexander arrested Arnold, White, and Keith, and notified the United States Customs Service.

After the marijuana was unloaded, the trailer was taken to the Hardeman County Sheriff's Department and inventoried. Nemo Britton, a U.S. Customs service agent, weighed the bales of marijuana and testified that they totaled approximately 493 kilograms (1,088.1 pounds, including the packing materials). In addition, Nemo identified three motel receipts, which were found in the truck, from Shaw's Komfort Motel in Savannah, Tennessee, McCaig's Motel in Lincoln, Alabama, and the River Plantation Inn in Savannah, Tennessee.

Bobby Towery, a federal prisoner who had pled guilty to the conspiracy count in White's indictment, gave the critical testimony for the government in this case, tying White to the drugs. Both Towery and White are in the same business: truck brokering. In essence, a truck broker finds businesses that need to have their goods delivered by trucks to various places across the country and supplies the trucks to transport those goods. In addition, if a truck driver is out on the road and has already delivered a load, instead of coming back empty, he can contact a broker, or a broker might contact him, to pick up a load nearby and deliver the load to a location that is on the trip back home. Towery testified that he mainly dealt with produce but had partnered with Fernando Morales, nicknamed "Nano," for a number of years, for the purpose of smuggling drugs. Nano had died prior to the trial and was therefore unavailable to testify. According to Towery, Nano would purchase the marijuana from Mexico, get it past the border into Texas, and package it for transport. Towery, who had his own trucks loaded with produce or other goods, would arrange to have Nano load his trucks with marijuana in Texas and then Towery would have drivers deliver the drugs to locations "up North" where he would get "rid" of each load, selling it to a local distributor.

Towery testified that in the instant case, Nano had contacted Towery, letting him know that he had a load of drugs (1,000 pounds), which he needed to have delivered to a distributor. Towery then called White, looking for a truck to transport the load further North, although Towery did

not know where the load was to be delivered or to whom. White told Towery that he would be in Edinburg, Texas, at the Rex Motel, in a few days. Towery does not elaborate in his testimony as to how this information was relayed to Nano, but one is left to assume that Towery informed Nano of White's availability and a pick-up was arranged in Texas. Frederico Orta, a state prisoner who was arrested with Towery on charges of selling and distributing marijuana, testified that he worked for Nano. Orta further testified that he had been instructed by Nano to pick up a truck at the Rex Motel in Edinburg that had watermelons in it, drive it to where the marijuana was located, load the marijuana into the truck, and return the truck to the Rex Motel. After doing so, Orta drove to Savannah and checked into Shaw's Komfort Motel, to verify the arrival of the truck in Tennessee. Orta testified that there were two people with him, but he was only willing to identify one of them: Felipe Clarke. Felipe Clarke testified, supporting Orta's testimony as to what happened.

When Orta and Clarke arrived at the motel in Savannah, Orta received a phone call from someone who told him that the truck was on its way, but had experienced some mechanical problems. Orta vaguely remembered that the person on the phone stated that "[m]y son will be there shortly or something like that." After the phone call, Orta testified that he left the motel and headed back to Texas, but passed the truck on the highway at the outskirts of Savannah. Natu Patel, the manager of Shaw's Komfort Motel in Savannah, testified that a man named Felipe Clarke had rented two rooms and had received a number of calls. Blaine Crum, another Customs Agent, testified that he found a manila envelope in White's Suburban with the telephone numbers of the River Plantation Inn and Shaw's Komfort Motel written on

it, along with the numbers of the rooms rented by Felipe Clarke.

The government presented, through the introduction of Keith's and White's phone records during the relevant time period, evidence of a number of phone calls between the two while Keith was on the road heading towards Tennessee with the drugs and the watermelons. In addition, the government offered evidence of White's telephone calling card having been used at the Rex Motel in Texas, and evidence of calls made by White on his cell phone to Towery, Shaw's Komfort Motel, and the River Plantation Inn. White testified that he did not make the call from the Rex Motel, but instead must have given his card number to one of his drivers, and stated that the calls from his cell phone were attempts to find someone who could help fix a mechanical problem that Keith was having with the truck's refrigeration unit. Nevertheless, the calls were perfectly correlated to the prosecution's version of events.

The next step involved delivering the drugs to the distributor. Towery testified that White called from Tennessee to tell him that "there was somebody trailing the load, following the load. That the guy had run off and left him and he didn't know what to do with it." White then asked for Nano's telephone number, which Towery gave to him. Kimmy Davis, a defense witness, testified that he was the distributor who was to purchase the bulk of the marijuana in this case, distributing it to various dealers. Davis apparently spoke with a man by the name of Ramon Loya who told Davis that he would deliver the marijuana to Savannah, Tennessee, and that it would then be up to Davis to "handle it from Savannah on." Davis had hired Frank Arnold to drive the truck with the drugs, once the delivery was made. On the day in question, Davis waited for a phone call to let him know where the

exchange was to take place. Eventually a person identifying himself as Jesse called Davis, telling him to meet the shipment at Shaw's Komfort Motel.

The connection between Loya, Davis's contact, and Nano was made through the testimony of Orta and Clarke. Orta testified that Nano and Loya were acquainted with each other, but that he didn't know the nature of their relationship. Felipe Clarke testified that he knew Ramon Loya, that Loya had a brother named Jesse, and that he had also been aware of a connection between Nano and Ramon Loya.

Davis and Arnold, the man who was driving the tractor-trailer when the police intercepted the load, went to meet Jesse at Shaw's Komfort Motel in Savannah. Jesse took them to the Plantation Inn where the tractor-trailer was parked. Arnold got out of the car in order to drive the tractor-trailer, and Davis continued on to a pre-arranged location in Adamsville, Tennessee, where Arnold was to meet him. Of course Arnold never arrived, since he had been intercepted by the police.

Finally, Towery testified to the fact that two or three days later, White called Towery from jail asking for Nano's number again because he wanted the $50,000 he was owed for making the delivery. Towery testified that he had someone deliver the $50,000 to a woman named Joyce who apparently worked with White, even though the drugs had been confiscated by the police. As Towery noted at trial, White "had his contract, and it got there." White testified at trial, denying any knowledge of the marijuana that was being transported in his truck, under the load of watermelons.

## II

### A. Motion for Acquittal

White contends that Towery's testimony should not have been admitted because it constituted hearsay and did not fall under the co-conspirator exception as there was insufficient evidence presented that White was a member of the conspiracy at issue in this case. White further argues that the government did not present enough evidence to sustain his conviction. We disagree, and hold there was sufficient evidence presented for the court to find by a preponderance of the evidence that White was in fact a member of the conspiracy for the purpose of admitting Towery's testimony under the co-conspirator exception and further, that there was sufficient evidence to find White guilty beyond a reasonable doubt.

### Towery's Testimony

Although White does not dispute that a conspiracy existed and that Towery's testimony, if true, amounts to statements made during the course and in furtherance of that conspiracy, White maintains that the government failed to establish, as required by *Bourjaily*, that White was a member of that conspiracy. *See Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). To be admissible under Fed.R.Evid. 801(d)(2)(E), the government must show by a preponderance of the evidence that 1) a conspiracy existed, 2) the defendant was a member of that conspiracy when the statement was made, and 3) the statement was made during the course and in furtherance of the conspiracy. *See ibid; United States v. Wilson,* 168 F.3d 916, 920 (6th Cir.1999). We sometimes refer to this as an *Enright* finding. *Cf. United States v. Enright,* 579 F.2d 980, 986–87 (6th Cir.1978). As was done in this case, the court may "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *United States v. Vinson,* 606 F.2d 149, 153 (6th

Cir.1979). Whether the government succeeded in making the necessary showing to meet the three foundational prerequisites described above as an *Enright* finding is a question of fact for the district court to decide and is reviewed only for clear error. *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir.1998) (citing *United States v. Breitkreutz*, 977 F.2d 214, 218 (6th Cir.1992)). However, we review the court's ultimate legal conclusion regarding admissibility *de novo. Ibid.* (citing *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir.1994)).

■ It is first important to clarify what part of Towery's testimony constitutes hearsay and is therefore inadmissible without an exception to the rule. The three conversations between Towery and White, which directly implicated White in the conspiracy at issue in this case, are not hearsay. Towery testified to the fact that he had called White to tell him of Nano's load of drugs, to see if an arrangement could be made to use one of White's trucks and drivers to pick up the load and transport it further North. Towery testified that White had informed Towery that he would be in Edinburg, Texas in a few days. Next, Towery testified that White had twice called him to get Nano's number, first in an effort to determine what should be done with the drugs, now that they had arrived in Savannah and second, to get the money owed to him for transporting the marijuana. Although many of the statements made by White to which Towery testified were offered by the government for the truth of the matter asserted, no *Enright* finding is necessary because they are not statements made by a co-conspirator in furtherance of a conspiracy, but are instead admissions of a party-defendant, admissible as "non-hearsay" under Fed. R.Evid. 801(d)(2)(A).

■ White's *Bourjaily* argument only has force with respect to Towery's testimony as to statements made by Nano, a co-conspirator, but the government did not need to rely on these statements to establish White's role in the conspiracy. *See United States v. Clark*, 18 F.3d 1337, 1341– 42 (6th Cir.1994) (holding that some independent, corroborating evidence beyond the co-conspirator's statements themselves demonstrating the defendant's knowledge of and participation in the conspiracy is required before a co-conspirator's statement will be admissible). Not only is there the direct testimony offered by Towery on this point, the government presented several other pieces of evidence in support of the conclusion that White was part of the conspiracy. For example, the envelope found in White's vehicle, which had written on it Orta's and Clarke's rooms at the Shaw Komfort Motel, White's presence at the Plantation Inn in Savannah, and White's cell phone activity, all of which corroborated the government's theory that White was supervising the operation. There is, in sum, enough evidence for the court to have found by a preponderance of the evidence that White was a member of the conspiracy. The district court did not commit clear error and Towery's testimony with regard to Nano's statements is admissible under Rule 801(d)(2)(E).

*Sufficiency of the Evidence*

Furthermore, the evidence provided by the government was sufficient for the jury to find beyond a reasonable doubt that White was a member of the conspiracy at issue in this case. This court reviews *de novo* a district court's ruling on a motion to acquit pursuant to Federal Rule of Criminal Procedure 29. *United States v. Lake*, 985 F.2d 265, 267 (6th Cir.1993). The relevant question in assessing a challenge to evidentiary sufficiency is "whether, after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also United States v. Sykes,* 292 F.3d 495, 498–99 (6th Cir.2002). "Circumstantial evidence alone, if substantial and competent, may sustain a conviction under this deferential standard of review." *United States v. Adams,* 265 F.3d 420, 423 (6th Cir.2001) (citations omitted).

To establish a drug conspiracy, in violation of 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that there was an agreement to violate drug laws, knowledge and intent to join the conspiracy, and participation in the conspiracy. *United States v. Gibbs,* 182 F.3d 408, 420 (6th Cir.1999). The government must prove that the defendant was aware of the object of the conspiracy and that he voluntarily associated himself with a plan to further the objectives of the conspiracy. *See id.* at 421. However, the "defendant need not be an active participant in every phase of the conspiracy, so long as he is party to the general conspiratorial agreement." *Ibid.* "The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great." *United States v. Betancourt,* 838 F.2d 168, 174 (6th Cir.1988). The agreement, intent to join it, and participation can all be inferred from acts done with a common purpose. *See United States v. Hughes,* 891 F.2d 597, 601 (6th Cir.1989). "Proof of a formal agreement is not required; it must only be proven that the members of the conspiracy had at least a tacit or material understanding to try to accomplish an unlawful goal." *United States v. French,* 974 F.2d 687, 696 (6th Cir.1992).

Towery's testimony, combined with the circumstantial evidence already discussed, is sufficient to support the jury's finding that White consciously participated in smuggling the marijuana at issue in this case. In particular, White's conversation with Towery in which he asked to be paid for performing his part of the operation was strong evidence that a rational finder of fact could have relied upon in this case. White argues that Towery's testimony is unreliable, pointing out that Towery admitted to having previously lied to the government in a statement he gave to Agent Crum in September 1996 and had entered into a plea agreement with the government. Yet, these facts were brought out at trial and it is not our role to judge the credibility of Towery's testimony. *See United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir.1993) (noting that this court does not weigh evidence, make credibility determinations, or substitute its judgment for that of the jury). In making this determination, we must "refrain from independently judging the credibility of witnesses or [the] weight of the evidence." *United States v. Walls,* 293 F.3d 959, 967 (6th Cir.2002). Moreover, all reasonable inferences are to be drawn in the government's favor. *United States v. Kelly,* 204 F.3d 652, 656 (6th Cir.2000). We therefore affirm the district court's denial of White's motion for acquittal.

**B. Prosecutorial Misconduct**

White contends that he is entitled to a new trial because of prosecutorial misconduct. In particular, White points to references made by the prosecutor to Keith White, the defendant's son, during his examination of Customs Agent Crum, and remarks made during the closing argument of the case in which the prosecutor vouched for the government's witnesses and expressed his personal opinion as to

Keith's veracity. Although we ultimately agree that the prosecutor's statements during closing arguments were improper and even inexcusable, we hold that the prosecutor's behavior did not amount to reversible error.

■ In examining prosecutorial misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole. *See United States v. Young,* 470 U.S. 1, 12, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (holding that it is critical to examine the statements at issue within the context of the entire record); *United States v. Francis,* 170 F.3d 546, 552 (6th Cir.1999) (noting that the determination of whether a prosecutor's behavior constitutes prejudicial error must be made in the context of the whole trial). In this case, all of the remarks at issue were made with regard to Keith, who played a crucial role in this crime. Nevertheless, Keith was not called to testify by either the government or the defendant, and as a result, both parties found it necessary to explain this omission to the jury during their closing arguments. The government claimed that because Keith had obstructed the investigation and could not be relied upon to tell the truth, the prosecutor could not ethically call him to testify. During the government's examination of Customs Agent Crum, the prosecutor attempted to support this theory by eliciting testimony to the effect that Keith had repeatedly lied to the police and had not cooperated during the course of the investigation. White's attorney objected to this line of questioning and the court sustained the objection for a lack of relevancy, allowing the prosecutor to ask only one more question of Agent Crum. The last question asked by the prosecutor was: "[u]p to this point, today, has Keith White cooperated with us in this investigation?" To which Agent Crum responded: "[n]o, sir." Throughout this testimony, the pros-

ecutor did not make any statements reflecting his own personal opinion concerning Keith's credibility.

The prosecutor revisited this issue in his closing argument, explaining that he had not put Keith on the stand because Keith had not cooperated with the government, but that White could have subpoenaed him to testify in support of his defense. White's lawyer then stated in his closing that since the presumption of innocence was on his client's side, it was up to the government to call Keith White to refute White's testimony. The prosecutor responded in his rebuttal argument, stating in relevant part:

> When I put a witness on the witness stand, then, generally, I'm vouching for that witness in the sense that I am believing that his testimony will be true. Now, occasionally you can put someone on the stand and that changes. The defense attorney says I did not know what Keith White was going to say is the reason we didn't put him on. That's part of it. But we've got to be reasonably sure that the defendant—or the witness is going to tell the truth. Since I could not be reasonably sure of that, I could not put Keith White on.

JA at 275.

It is a basic tenet of our judicial system that a prosecutor cannot express his or her own personal beliefs and opinions concerning the credibility of a witness. *See, e.g., United States v. Young,* 470 U.S. 1, 9–10, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Modena,* 302 F.3d 626, 634 (6th Cir.2002); *United States v. Emuegbunam,* 268 F.3d 377, 404 (6th Cir.2001). Such statements are improper for two reasons: they "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be

tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Gall v. Parker*, 231 F.3d 265, 312 (6th Cir.2000). In this case, although the prosecutor's questioning of Agent Crum was correctly curbed by the trial court as irrelevant, it did not cross the line into prosecutorial misconduct since the prosecutor did not express his own personal opinion. However, the statements quoted above from the prosecutor's closing argument were entirely improper. In his attempt to explain further why he wasn't putting Keith on the stand, the prosecutor vouched for the credibility of every government witness.

Since White did not object at trial to the comments made by the prosecutor during his closing argument, we review this claim for plain error. *See Modena*, 302 F.3d at 634. In reviewing a claim of prosecutorial misconduct under the plain-error standard of review, we undertake a two-step process. After determining that the statements were improper, we must turn to the second step and determine whether the impropriety amounts to reversible error. *Ibid.* An improper prosecutorial remark rises to the level of reversible error only if we determine within the context of the whole trial that the statement was prejudicial to the point of rendering the defendant's trial fundamentally unfair. *See Young*, 470 U.S. at 14–15 (1985) (holding that although the prosecutor had made improper statements amounting to error, the error was not reversible under plain-error review since "[v]iewed in context, the prosecutor's statements ... were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."). *See also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997) (holding that this court will not overturn a verdict

unless the conduct is "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, ... or so gross as probably to prejudice the defendant.") (internal citation and quotation omitted) (applying harmless error standard).

To determine if a statement is sufficiently flagrant, effectively rendering White's trial fundamentally unfair, this court considers the following factors: 1) whether the remarks tended to mislead the jury or to prejudice the accused; 2) whether the remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally placed before the jury; and 4) the overall strength of the evidence against the accused. *United States v. Green*, 305 F.3d 422, 429 (6th Cir.2002); *Francis*, 170 F.3d at 550 (citing *United States v. Monus*, 128 F.3d 376, 394 (6th Cir.1997)).

■ We hold that the prosecutor's statements during his closing, although improper, were not sufficiently flagrant to merit a reversal of White's conviction and a new trial. First, although the prosecutor's remarks vouching for the government's witnesses could have been prejudicial to White, his statements with regard to Keith's veracity were unlikely to be prejudicial since it was not in the interest of the defense for Keith to be perceived as an honest person. After all, if White's theory is to be accepted, the jury must believe that Keith lied to his father, hiding the fact that he was transporting marijuana. Second, the prosecutor made improper remarks during only a portion of his closing argument and thus the improper conduct was isolated and not pervasive throughout the trial. Finally, although the statements at issue were deliberately made in front of the jury, the total strength of the evidence against White is substantial, as already discussed above in Part II.A. In sum, the relevant factors do not provide strong support for White's

claim that the prosecutorial misconduct in this case was flagrant, and when combined with the fact that White bears the burden of demonstrating that the remarks had an effect on the jury's verdict in this case, it is apparent that a reversal of White's conviction is not warranted. *See Modena*, 302 F.3d at 635 (holding that the defendant bears the burden of showing that the prosecutorial misconduct at issue is so flagrant that it constitutes plain error) (citation omitted).

Our upholding White's conviction in this case should not be construed as suggesting that we condone the prosecutor's unprofessional behavior in this case. While it is true that the prosecutor cannot knowingly put a witness on the stand with the expectation that the witness will lie, the prosecutor also cannot explain to the jury the logical implication of that ethical obligation. Ideally, a trial judge should deal promptly with any breach of this type through a curative admonishment to the jury, which is why opposing counsel have an obligation to make an objection at the first sign of such behavior. However, in cases in which no timely objection has been made, we are authorized "to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings." *Young*, 470 U.S. at 15 (internal quotation marks and citations omitted). For the aforementioned reasons, we hold that the prosecutor's remarks did not render White's trial fundamentally unfair and that the prosecutorial misconduct in this case does not warrant a new trial.

### III

For the reasons given above, we AFFIRM White's conviction.