NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0168n.06

Case Nos. 24-5610/5626/5641

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td style="padding-left:2em">Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>JORGE FLORES (24-5610); KEVIN TIDWELL</td><td>)</td></tr>
<tr><td>(24-5626); JOSE PINEDA-CACERES, aka Jose</td><td>)</td></tr>
<tr><td>Pineda-Caceras (24-5641),</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em">Defendants-Appellants.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

FILED
Apr 15, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

O P I N I O N

Before: COLE, MATHIS, and HERMANDORFER, Circuit Judges.

COLE, Circuit Judge. The government criminally charged nine defendants, including Jorge Flores, Kevin Tidwell, and Jose Pineda-Caceres, for their involvement in gang-related activity. After an 18-day joint trial, the jury convicted the three defendants at issue here. The district court sentenced Flores to life imprisonment, plus 65 years; Tidwell to life imprisonment, plus 30 years; and Pineda-Caceres to 50 years' imprisonment. On appeal, defendants challenge their convictions. We affirm the district court on all grounds.

I.

La Mara Salvatrucha, known as MS-13, is a transnational criminal gang structured as a network of smaller units that operate semi-independently in different geographic locations. Flores joined MS-13 through the Nashville-based Thompson Place Locos Salvatrucha (TPLS) group in 2008. Tidwell joined MS-13 and TPLS in 2017. Pineda-Caceres has been affiliated with MS-13

since childhood and became a TPLS member in 2016. Between 2014 and 2021, the three defendants attempted and committed multiple crimes.

Relevant to this appeal, in February 2017, Flores and other MS-13 members conspired to kill Hector Venturas, who had dissociated from the gang, as well as two rival drug dealers. Following an active shootout, Venturas and the two dealers escaped. In May 2017, Flores and Tidwell followed Ammerli Garcia-Munoz, a purported rival gang member, into a nightclub parking lot, where they killed him. Six days later, Flores and Tidwell killed Jesus Alberto Flores and attempted to shoot Luis Rosero. In September 2017, Flores and another MS-13 member decided to kill Arling Laines, who they believed was "playing both sides" with MS-13 and a rival gang. (Trial Tr. Vol. 14, R. 611, PageID 5402.) They brought Laines to an isolated area and fatally shot him.

In July 2021, a grand jury indicted Flores, Tidwell, Pineda-Caceres, and others in a 60-count second superseding indictment. The three defendants, alongside another co-defendant not included in this appeal, proceeded to a joint jury trial in April 2023.

At the close of trial, the jury convicted the defendants of multiple charges, including conspiracy to participate in racketeering activity on behalf of MS-13, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). Relatedly, the defendants were also convicted of conspiracy to commit murder in aid of racketeering and murder in aid of racketeering, in violation of Violent Crimes in Aid of Racketeering Activity (VICAR), 18 U.S.C. § 1959(a)(1), (5).

The district court sentenced Flores to life imprisonment, plus 65 years; Tidwell to life imprisonment, plus 30 years; and Pineda-Caceres to 50 years' imprisonment. The defendants timely appealed.

II.

On appeal, the defendants challenge various aspects of their convictions. Flores contends that the district court erroneously denied his motion to suppress evidence. Meanwhile, Tidwell asserts that several prospective jurors' expression of fear improperly tainted voir dire. Tidwell further maintains that the district court erred by permitting overly expansive testimony from a gang expert; admitting unrelated co-conspirator statements; declining to declare a mistrial after a co-defendant changed his plea mid-trial; finding sufficient evidence supported his conviction; and failing to find his conviction was against the manifest weight of the evidence. Finally, Pineda-Caceres argues that the district court violated his constitutional rights by excluding the testimony of two witnesses. We address each defendant's arguments in turn.

A.

Before trial, Flores moved to suppress evidence obtained during a warrantless sweep of his residence as well as evidence later seized pursuant to a search warrant. The district court denied the motion, concluding that the sweep qualified as a protective sweep and probable cause supported the search warrant. On appeal, Flores renews only his argument that the warrantless sweep exceeded the scope of a protective sweep. We limit our analysis accordingly.

First, we recount the relevant facts. Officers arrested Flores outside of his residence and conducted a warrantless sweep inside, locating two additional MS-13 members—Franklin Hernandez and Franklin Pineda-Caceres—who were arrested on outstanding warrants. During the sweep, officers observed a Glock pistol drum magazine in a downstairs bedroom and an AR-15 style rifle in a downstairs bathroom. After obtaining a search warrant, officers returned and seized those items, as well as other firearms, a digital scale, ammunition, phones, marijuana, cocaine, and other evidence.

"Where the issue on appeal is the denial of a motion to suppress, we review the district court's findings of fact under the clear-error standard and its conclusions of law de novo." *United States v. Quinney*, 583 F.3d 891, 893 (6th Cir. 2009) (citing *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)). We view evidence "in the light most likely to support the district court's decision." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). And a "denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019) (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)).

The Fourth Amendment safeguards individuals against unreasonable searches of "their persons, houses, papers, and effects." U.S. Const. amend. IV. As a general rule, "the government may not search an individual's home without the individual's consent or a search warrant supported by probable cause." *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007) (citing *Payton v. New York*, 445 U.S. 573, 589–90 (1980)). An exception, however, permits officers making an arrest "to conduct a 'protective sweep'—a 'quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others.'" *Id.* (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)).

Thus, officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or reasonable suspicion. *Buie*, 494 U.S. at 334. But a broader sweep requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Notably, this second type of protective sweep is not meant to be a "full search of the

premises," but rather "extend[s] only to a cursory inspection of those spaces where a person may be found." *Id.* at 335.

At the suppression hearing, the district court relied on four articulable facts to hold that reasonable suspicion supported the protective sweep: (1) Flores had a warrant for murder; (2) "source information" from his phone strongly suggested that he would be found with other MS-13 members at the residence; (3) a woman at the residence who initially spoke with officers "switched her story" about who was present; and (4) someone closed the door after Flores and the woman exited, indicating that another person remained inside. (3:19-cr-42, Flores Suppression Hr'g Tr., R. 59, PageID 229–30.) Based on testimony describing the search, the district court denied the motion to suppress, emphasizing that the "law really is very much in the government's favor on this protective sweep issue." (*Id.* at PageID 235.)

We have held that "a defendant's own dangerousness is not relevant in determining whether the arresting officers reasonably believed that someone else inside the house might pose a danger to them, as those facts reflected only the dangerousness of the arrested individual, not others." *United States v. Archibald*, 589 F.3d 289, 299 (6th Cir. 2009) (citation modified). The district court therefore could not have relied on Flores's warrant for murder alone in assessing the protective sweep.

Even so, evidence indicated that other dangerous individuals were likely inside the residence. We have approved protective sweeps where "the officers had strong circumstantial evidence that potentially dangerous criminal accomplices might be present." *Id.*; *see also Wilson v. Morgan*, 477 F.3d 326, 339 (6th Cir. 2007); *United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995). Here, officers were advised before the operation that Flores would likely be with Hernandez, Franklin Pineda-Caceres, or both. Those individuals had outstanding warrants and

were suspects in several murders. And as noted, after Flores's arrest, someone inside closed the door. These facts, taken together, justified the district court's determination that reasonable suspicion supported the protective sweep; thus, we find no error. *See Wilson*, 477 F.3d at 339.

Flores does not contest that conclusion, but instead raises new questions not presented below. He asks, for example, "[d]id law enforcement continue to search the residence after [Hernandez and Franklin Pineda-Caceres] had been found on the second floor? Who found [them] and when?" (Flores Appellant Br. 12.) Because Flores raises these suppression questions for the first time on appeal, they are forfeited. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019)*.*

### B.

Next, Tidwell raises six arguments regarding his convictions and sentence. We review his first three challenges for plain error, his fourth and sixth challenges for abuse of discretion, and his fifth challenge de novo.

To demonstrate plain error, Tidwell must show "(1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Abboud*, 438 F.3d 554, 583 (6th Cir. 2006) (quoting *United States v. Wright*, 343 F.3d 849, 861 (6th Cir. 2003)). The district court abuses its discretion when it relies on clearly erroneous findings of facts, applies the law improperly, or utilizes an incorrect legal standard. *See United States v. Harris*, 881 F.3d 945, 949 (6th Cir. 2018).

We address each of his challenges in turn.

### 1.

Tidwell's first challenge arises from voir dire. There, three prospective jurors voiced their fears about MS-13's dangerousness, prompting defense counsel to assert that the comments tainted

the jury pool. The district court responded with a curative instruction directing jurors to decide the case based only on the evidence and law and to set aside any preconceptions, and the parties agreed to strike the three prospective jurors for cause. On appeal, Tidwell contends the court's response was inadequate and deprived him of an impartial jury.

"Because the obligation to empanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions," we afford the district court broad discretion in deciding the best way to carry out voir dire. *United States v. Silvers*, 129 F.4th 332, 350 (6th Cir. 2025) (citation modified), *cert. denied*, No. 25-222, 2026 WL 79964 (Jan. 12, 2026). Generally, we apply the abuse-of-discretion standard in reviewing a district court's voir dire process with the "district court retain[ing] great latitude in deciding what questions should be asked on voir dire." *Id.* (citation modified).

But although Tidwell, through counsel, initially expressed concern about prospective jurors' gang-related remarks affecting the jury pool, he neither contemporaneously objected after the court's curative instruction nor moved for a mistrial. Thus, we review for plain error. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).

The Sixth Amendment protects the right of accused individuals facing criminal prosecution to "a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. "A qualified juror need not be 'totally ignorant of the facts and issues involved.'" *Miller v. Webb*, 385 F.3d 666, 673 (6th Cir. 2004) (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (citing *Spies v. Illinois*, 123 U.S. 131 (1887)). But, if actual bias is discovered during the voir dire process, the court must excuse that prospective juror. *See Hughes v. United States*, 258 F.3d 453, 459 (6th Cir. 2001). "Bias can be

revealed by a juror's express admission of that fact, but more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence." *Id.* (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977)).

Here, Tidwell must demonstrate that a juror who was ultimately empaneled was biased against him, rather than relying on the bias of dismissed prospective jurors. *See Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) ("Any claim that the jury was not impartial, therefore, must focus not on [the dismissed jurors], but on the jurors who ultimately sat."). He nevertheless contends that the dismissed prospective jurors' comments were so biased and fearful that they likely influenced those who were empaneled. But we, along with other circuits, have consistently rejected efforts to overturn a venire based on one or two statements by prospective jurors, even when those jurors acknowledge their potential biases. *See United States v. Guzman*, 450 F.3d 627, 631 (6th Cir. 2006) (collecting cases).

Regardless, Tidwell urges us to consider out-of-circuit authority, namely *United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010). In *Blitch*, the Seventh Circuit vacated the defendants' convictions and remanded for a new trial in large part because after deliberations had begun, all jurors raised concerns about their safety—including fear of retaliation—and the district court there addressed those concerns collectively, rather than conducting individualized voir dire. 622 F.3d at 665–68.

But Tidwell's reliance on *Blitch* is misplaced. Here, only a few prospective jurors—not all—voiced safety concerns about participating in the trial. Moreover, the district court intentionally delayed giving curative instructions, per the defense's request, to allow for further probing of the jury pool about potential bias. Jurors thereafter agreed that they could serve impartially.

The court also repeatedly instructed the jury to maintain its impartiality and reiterated that the jury's decision must be based on only the evidence presented at trial. We have previously held that similar instructions were sufficient to cure any possibility that prospective jurors had tainted the jury pool. *See, e.g.*, *Reynolds v. Bagley*, 498 F.3d 549, 556 (6th Cir. 2007) (concluding that while prospective juror's comments "could *theoretically* have biased ultimately-seated jurors," the defendant still "failed to show that there was any *actual* bias").

In sum, the district court did not plainly err in conducting voir dire. *See Vonner*, 516 F.3d at 385.

2.

Next, Tidwell challenges the admission of expert testimony on MS-13. He argues the expert improperly opined on the mental states of specific MS-13 members.

Before trial, the government notified the district court and defense counsel that it intended to call Raymond Betts—a Fairfax County Police detective and FBI MS-13 Safe Streets Task Force officer—to testify as an expert on the "the habits and practices of Latino gangs generally, and MS-13 in particular." (Government's Notice of Expert Test., R. 401, PageID 1351.) Tidwell did not object. During trial, Betts testified about MS-13's general practices and rules, as well as how gangs function. On cross-examination, Betts clarified that he had not investigated the TPLS gang and did not have knowledge about Nashville-based groups. Again, neither Tidwell nor any other defendants objected to Betts's testimony during trial. Because Tidwell failed to object at trial, we review this challenge for plain error. *See United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).

Tidwell argues that Betts's testimony was overly deterministic and impermissibly addressed the defendants' mental states, thus exceeding the limits of Federal Rule of Evidence

704(b). Rule 704(b) "proscribes only expert opinions in a criminal case that are about a particular person ('the defendant') and a particular ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense')." *Diaz v. United States*, 602 U.S. 526, 534 (2024). Testimony about what "most" similarly situated defendants know is permissible because it leaves the ultimate inference about the specific defendant's intent to the jury. *Id.* at 534–35.

Consistent with *Diaz*'s limitations, we have recognized that law-enforcement expertise is particularly relevant "when it imparts evidence regarding the inner-workings of organized crime." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (citation modified). For example, we upheld the admissibility of a detective's testimony that explained a national gang's general culture to help the jury determine whether a Columbus offshoot was a criminal enterprise. *United States v. Ledbetter*, 929 F.3d 338, 349 (6th Cir. 2019). There, the detective clarified that "he was not familiar with any gang sets in Columbus and was testifying 'just generally [about] what you see nationally.'" *Id.* (alteration in original).

Similarly, Betts testified about MS-13's national operations to provide general background. He did not opine on Tidwell's mental state or specific acts committed by Tidwell or other MS-13 members. Instead, Betts repeatedly emphasized that he had no "particular knowledge of the [gang] in Nashville." (Trial Tr. Vol. 4, R. 605, PageID 4045.) He thus confined his testimony to MS-13's general practices. *See Ledbetter*, 929 F.3d at 349.

The district court, therefore, did not plainly err by admitting Betts's testimony.

3.

Tidwell also challenges the district court's admission of testimony from former MS-13 member Francisco Avila as co-conspirator statements. Specifically, Avila testified that another

member rose in the ranks after killing Garcia-Munoz, a rival gang member, with assistance from Flores, Tidwell, and a third co-conspirator.

The district court outlined its procedure for admitting co-conspirator statements in a pretrial order. It explained that it would conditionally admit alleged co-conspirator hearsay if the government properly invoked Federal Rule of Evidence 801(d)(2)(E) with the condition that defendants could still object. The district court also required any objecting defendant to renew the objection at the close of evidence or risk waiver.

At trial, Tidwell's counsel objected to Avila's testimony, and the court reminded the parties that objections would be "logged for later discussion." (Trial Tr. Vol. 6, R. 600, PageID 2986.) Despite this, Tidwell failed to renew the objection at the close of trial. Instead, months later, he moved for a new trial, which the court denied. Because Tidwell failed to renew his objections at the close of trial, we review for plain error. *See Kilpatrick*, 798 F.3d at 378.

Under Rule 801(d)(2)(E), co-conspirator statements are not hearsay if "made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The government must establish admissibility by a preponderance of the evidence. *United States v. Young*, 847 F.3d 328, 352 (6th Cir. 2017). "To admit the statements of a co-conspirator under Rule 801(d)(2)(E), a trial court must find that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy." *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009). The district court may "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Id.* (quoting *United States v. White*, 58 F. App'x 610, 614 (6th Cir. 2003)).

A statement qualifies as furthering a conspiracy if it is intended to advance the conspiracy's goals. *See United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005). This can include statements that inform co-conspirators of progress, encourage continued participation, or help conceal the conspiracy during its operation. *Id*. A district court may admit such statements "even if not exclusively, or even primarily, made to further the conspiracy." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (citation modified). But conversations that amount to "nothing more than idle chatter or casual conversation about past events" are not admissible as co-conspirator statements. *Id.* (quoting *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994)).

Here, Avila testified that as an MS-13 member, he was expected to stay "up to date" on the gang's activities, including murders, to observe if anyone had transgressed on the gang's rules and practices. (Trial Tr. Vol. 6, R. 600, PageID 3018.) Avila, therefore, was not merely recounting past events. *See Tocco*, 200 F.3d at 419. Rather, the conversations to which he testified kept him apprised of gang activities. This was vital to his understanding of the hierarchies in MS-13 and furthered his participation in the conspiracy. *See Martinez*, 430 F.3d at 327.

Accordingly, the district court did not plainly err in admitting the co-conspirator statements "because the record demonstrated that a conspiracy existed, that [Tidwell] was a member of the conspiracy, and that the statements were made in furtherance of the conspiracy." *See Young*, 847 F.3d at 353.

4.

Further, Tidwell renews his challenge to the district court's denial of his motion for a mistrial.

After the seventh day of trial, co-defendant Luis Colindres pleaded guilty to several of the charges in the second superseding agreement. The following day, Tidwell's counsel moved orally

for a mistrial, arguing that the "only rational inference" the jury could make if Colindres did not appear at trial was that he pleaded guilty. (Trial Tr. Vol. 8, R. 607, PageID 4446–48.) The district court denied the motion and instead instructed the jurors not to speculate about Colindres's absence both that day and in its final instructions before deliberations.

At the conclusion of trial, Tidwell pressed again for a mistrial because of Colindres's plea. The court denied Tidwell's motion, finding that counsel had postulated harms from Colindres's absence that were "really very speculative." (Teleconference Tr., R. 730, PageID 7551.)

"A defendant may move for a mistrial where there is a legitimate claim of seriously prejudicial error." *United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990). We review the district court's denial of a motion for mistrial for abuse of discretion. *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019). Generally, a district court may issue missing-defendant instructions to address the departure of a co-defendant during trial. *See United States v. Walker*, 1 F.3d 423, 428 (6th Cir. 1993). Courts presume that juries follow such instructions and that any potential prejudice arising from a co-defendant's absence can be adequately mitigated. *See, e.g.*, *United States v. Garrison*, 888 F.3d 1057, 1066 (9th Cir. 2018); *United States v. Barrientos*, 758 F.2d 1152, 1156 (7th Cir. 1985).

Tidwell, however, argues that the court abused its discretion because he did not have the opportunity to cross-examine Colindres and, therefore, the jury was free to speculate about Colindres's absence. *See United States v. Bavers*, 787 F.2d 1022, 1028 (6th Cir. 1985). But Tidwell could have called Colindres as a witness and chose not to do so. He also did not request a limiting instruction or object when the district court admitted evidence of Colindres's crimes after his departure.

Thus, the district court did not abuse its discretion in denying Tidwell's motion for a mistrial.

5.

Tidwell next disputes the district court's conclusion that the evidence was sufficient to sustain his RICO and VICAR convictions. During trial, Tidwell's counsel moved orally for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court invited the defendants to submit briefing on the issue. The court ultimately denied the motion.

Tidwell now renews his sufficiency challenge. We review a challenge to the sufficiency of the evidence supporting a conviction de novo. *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014). "When the defendant challenges the sufficiency of the evidence to support a jury verdict, we review the evidence in the light most favorable to the government." *United States v. Woods*, 14 F.4th 544, 551 (6th Cir. 2021) (citing *United States v. Bailey*, 973 F.3d 548, 564 (6th Cir. 2020)).

Tidwell specifically contests the evidence underlying the RICO conspiracy charge, the credibility of testimony offered by former MS-13 members turned informants, and the proof of his alleged involvement in the murders and attempted murder. For the reasons below, we cannot conclude the district court erred by denying Tidwell's motion for acquittal.

i.

Tidwell first argues that the evidence does not support the existence of a single criminal enterprise under RICO.

Tidwell was charged with RICO conspiracy. To prove a RICO conspiracy, the government must establish

- 14 -

> (1) that an enterprise existed; (2) that the enterprise was engaged in, or its activities affected interstate or foreign commerce; (3) that the defendant was employed by or associated with the enterprise; and (4) that the defendant conspired to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

*United States v. Baskerville*, 164 F.4th 459, 476 (6th Cir. 2026); *see also United States v. Householder*, 137 F.4th 454, 469–70 (6th Cir. 2025). Tidwell focuses only on the first element, and so we confine our analysis to whether sufficient evidence establishes that that MS-13 is a criminal enterprise.

Construed in favor of the verdict, the evidence in the record supports that MS-13 functioned as a RICO enterprise. Pursuant to 18 U.S.C. § 1961(4), an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The Supreme Court has further clarified that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

MS-13 has these three features. Trial testimony established that MS-13 had a general purpose: to obtain funds through extortion and the sale of controlled substances and firearms. Gang members built relationships with one another within TPLS. For example, they held regular meetings to discuss gang activities and receive orders, sometimes "from a higher-up leader in El Salvador." (Trial Tr. Vol. 4, R. 605, PageID 4031.) They shared firearms freely with one another. And gang members worked together to hide the evidence of their crimes. Moreover, MS-13 is a long-running organization founded in the 1980s. For its part, TPLS has operated in the Nashville area for at least a decade. Given these facts, a rational jury could reasonably conclude that MS-13 is an association-in-fact enterprise. *See Boyle*, 556 U.S. at 946.

Tidwell argues that TPLS was not a legitimate group of MS-13. He contends the murders of Laines, Alberto Flores, and Alvarado were unsanctioned by MS-13. But he ignores the contrary evidence: former TPLS members testified that they followed MS-13 rules and policies, and TPLS communicated regularly with MS-13's El Salvador-based leadership. Further, leadership told members that it was "always a go" to kill someone presenting themselves as a rival gang member. (*See, e.g.*, Trial Tr. Vol. 14, R. 611, PageID 5396.) MS-13 punished gang members who violated organizational rules. Even if some of the killings were personally motivated, that alone does not negate the existence of the central conspiracy. *See United States v. Fields*, 763 F.3d 443, 468 (6th Cir. 2014).

Thus, Tidwell's challenge to the existence of a RICO enterprise fails.

ii.

Relatedly, Tidwell contends that the evidence is insufficient to sustain his VICAR convictions for murdering Garcia-Munoz and Alberto Flores and attempting to murder Rosero.

A VICAR conviction requires the government to prove five elements: (1) that the organization was a RICO enterprise, (2) that the enterprise engaged in racketeering activity, (3) that the defendant held a position in the enterprise, (4) that the defendant committed the alleged violent crime, and (5) that he acted to maintain or increase his position. *Woods*, 14 F.4th at 555. "Circumstantial evidence alone can defeat a sufficiency challenge." *Id.* at 551 (citation modified). We consider his challenge to each conviction.

First, Tidwell argues that the circumstantial testimony of his co-conspirators does not support his conviction for murdering Garcia-Munoz. But multiple witnesses testified that Tidwell and Flores together shot Garcia-Munoz, and surveillance videos supported their accounts.

Tidwell's cellphone tower data also geolocated him to the area where Garcia-Munoz was murdered at the time of his death.

Next, Tidwell challenges his conviction for the attempted murder of Rosero. He argues that Rosero's drug and alcohol use on the night of the crime and subsequent police interference compromised his testimony. During cross-examination, however, Rosero clarified that the police "didn't help [him] as to identify [Tidwell]. They helped [him] and to calm [him] down and have patience with [him] because of what [he] had just gone through." (Trial Tr. Vol. 10, R. 602, PageID 3471.) At bottom, "the jury chose to believe" Rosero's testimony, and "we cannot substitute our opinion" of that testimony "for that of the jury." *Baskerville*, 164 F.4th at 476 (citation modified).

Finally, we assess the sufficiency of the evidence for Tidwell's conviction for the murder of Alberto Flores. Surveillance video, firearm casings, cellphone tower data, and other evidence support the conclusion that Tidwell was involved with this murder.

Accordingly, a rational jury could reasonably conclude that Tidwell's VICAR convictions are supported by sufficient testimonial and circumstantial evidence. *See Woods*, 14 F.4th at 555.

iii.

Next, Tidwell seeks to undermine the credibility of the government's witnesses. He argues the government incentivized the cooperating gang members to testify in the hopes of receiving a reduced sentence. He also argues these witnesses repeatedly lied to the police. He contends the remaining challenged witnesses lied or exaggerated to avoid reprisals from MS-13.

We cannot weigh the evidence or assess the credibility of witnesses who testified. *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014); *see also United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010). Rather, we resolve credibility issues "in favor of the jury's verdict."

*United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008) (citing *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006)).  And we have rejected sufficiency challenges tied to witness credibility where witnesses cooperated with the government.  *See United States v. Hinojosa*, 67 F.4th 334, 341 (6th Cir. 2023).

Here, Tidwell contends that a rational trier of fact would have been skeptical of the motives and diverging stories of certain witnesses.  But he disregards that during cross-examination, counsel questioned witnesses about their incentives to testify, their lies and inconsistent statements, and their own violent crimes.  The district court also encouraged the jurors to assess how the witnesses' relationships with the government might have impacted their credibility.  (*See* Trial Tr. Vol. 17, R. 614, PageID 6040.)

Ultimately, the jury weighed the evidence and found the testimony against Tidwell credible, and thus convicted him.  Because we resolve credibility disputes in favor of the jury's verdict, we conclude the jury had sufficient evidence to convict Tidwell.  *See Fekete*, 535 F.3d at 476.

6.

Finally, Tidwell relies upon similar arguments to assert that his conviction was against the manifest weight of the evidence.  At the trial's conclusion, Tidwell moved for a new trial under Federal Rule of Criminal Procedure 33.  The district court denied his motion.

Under Rule 33, a "reversal based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence."  *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).  In making such an evaluation, trial judges "take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a

miscarriage of justice." *United States v. Matthews*, 31 F.4th 436, 448–49 (6th Cir. 2022) (quoting *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018)). But our review "is limited to determining whether the trial court's ruling was a clear and manifest abuse of discretion." *Id.* at 449 (citation modified).

There was no such abuse of discretion here. The district court noted that it was evaluating the evidence from its position as the thirteenth juror, asking whether "even if a reasonable jury could have returned a verdict, the [c]ourt is so bothered by that decision that it thinks that the verdict should be overturned and a new trial ordered." (Teleconference Tr., R. 730, PageID 7518.) It then applied that standard as it carefully reviewed the motions put forth by Tidwell. For example, in denying Tidwell's motion for a new trial, the court explained that the government had thoroughly established MS-13's structure and TPLS's activities and that Tidwell's involvement was amply supported by both testimony and corroborating evidence.

Considering the record, the district court did not clearly and manifestly abuse its discretion by denying Tidwell's motion for a new trial under Rule 33. *See Matthews*, 31 F.4th at 449.

C.

Pineda-Caceres contends that the district court violated the Confrontation Clause by excluding testimony he sought to introduce to impeach three government witnesses—all former MS-13 members turned informants. Specifically, he argues that the court erred in barring testimony from corrections officer Jerry Farmer and nurse Cassandra Thompson that one of those informants, Venturas, continued using MS-13 hand signs and making violent threats in jail. He also challenges the credibility of Venturas and the two other informants, Avila and Hernandez, asserting that all three offered testimony that was "self-contradictory and often inconsistent with the physical evidence." (Pineda-Caceres Appellant Br. 2.) But although Pineda-Caceres points to

purported inconsistencies in Avila's and Hernandez's testimony, he provides no supporting authority for those assertions and focuses his argument on Venturas's testimony alone.

The Sixth Amendment's Confrontation Clause guarantees criminal defendants the right "to be confronted with the witnesses against [them]." U.S. Const. amend. VI. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Thus, a district court violates the Confrontation Clause when it bars a defendant from "engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Of course, this right to confront witnesses is not unconstrained. For example, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679.

We review evidentiary rulings regarding alleged violations of the Confrontation Clause de novo. *United States v. Taylor*, 127 F.4th 1008, 1013 (6th Cir. 2025). We apply a three-step framework to determine whether a defendant's confrontation rights were violated. *Id.* at 1014. First, we ask whether "the district court limited the defendant's ability to cross-examine a witness about his bias, prejudice, or motive to testify." *Id.* (citation modified). If it did, we proceed to the second step and consider whether, "despite the limits placed on otherwise permitted cross-examination," the jury nonetheless had adequate information to assess Pineda-Caceres's "theory of bias or improper motive." *See id.* (quoting *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000)). If the jury lacked sufficient information to evaluate the defense's theory, we move to the third step, which is "a balancing test" that weighs the government's interests against Pineda-Caceres's right

to confront adverse witnesses. *See id.* And if we find that a constitutional violation transpired, we conduct a harmless-error analysis. *Id.* at 1013.

We first consider whether the district court limited Pineda-Caceres's ability to cross-examine Venturas for bias, prejudice, or motive. *See Boggs*, 226 F.3d at 739. Pineda-Caceres sought to introduce extrinsic evidence under Federal Rule of Evidence 608(b), which generally excludes the introduction of extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," unless the evidence is a criminal conviction under Federal Rule of Evidence 609. Fed. R. Evid. 608(b). Rule 608(b), however, preserves "the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias[,] and mental capacity)." Fed. R. Evid. 608 advisory committee's note to 2003 amendment. Thus, if the proposed testimony was aimed at showing bias rather than character for truthfulness, its exclusion could implicate the right to confrontation. *See Van Arsdall*, 475 U.S. at 680.

A closer examination of the proposed testimony shows why the district court concluded it would not impeach Venturas. Farmer, a correctional officer at Venturas's facility, would have testified that Venturas became enraged after being asked to leave his cell. Venturas allegedly gestured "like a gun symbol and stuff like that" and threatened to kill another officer, describing "different ways of how he was going to kill" the officer. (Trial Tr. Vol. 15, R. 612, PageID 5678–79.) Although Farmer stated that he was "familiar with a little bit of gang signs," he could not "remember what [other] sign was made." (*Id.* at PageID 5679.)

Similarly, Thompson, a nurse at the facility, would have testified that when she confronted Venturas about hoarding medication, he "became very angry, threatened to apparently snap my

neck, and had to be escorted out of the office by the deputy." (*Id.* at PageID 5684.) Notably, according to both witnesses, Venturas did not reference any gang affiliation during that exchange.

Pineda-Caceres argues that this proposed testimony was admissible because it demonstrated bias, namely that Venturas "still retained an allegiance to MS-13, who would assist him in harming anyone who got sideways with him." (Pineda-Caceres Appellant Br. 15.) But this overstates the proposed testimony. After all, as the district court emphasized, "there was no testimony elicited at trial that gun gestures have any significance to or affiliation with MS-13." (Teleconference Tr., R. 730, PageID 7528.) And the court reasonably found the alleged threats "inconsistent with the notion that [Venturas] was still in a gang and had people that could carry out a hit for him." (*Id.* at PageID 7529.) Because the proffered testimony did not meaningfully establish bias tied to current gang affiliation, its exclusion did not substantially curtail cross-examination on "bias, prejudice[,] or motive to testify." *See Boggs*, 226 F.3d at 739.

Further, Pineda-Caceres and his co-defendants cross-examined Venturas at length about the benefits he received for cooperating and about his jailhouse conduct, thus meaningfully inquiring into his credibility for the jury's consideration. *Cf. United States v. Adams*, 722 F.3d 788, 834 (6th Cir. 2013). And multiple witnesses besides Venturas, Avila, and Hernandez testified about the defendants' crimes. Therefore, any evidentiary error here was harmless. *See Harris*, 881 F.3d at 950.

Accordingly, we affirm the district court's exclusion of the proffered testimony.

### III.

For the foregoing reasons, we affirm the defendants' convictions and sentences.